**ENTERRA CORPORATION, et al.**

**v.**

**SGS ASSOCIATES, et al.**

**Grace WALLEN, et al.**

**v.**

**James M. BALLENGEE, et al.**

Civ. A. Nos. 84–2174, 84–4050.

United States District Court,
E.D. Pennsylvania.

Jan. 9, 1985.

Gregory M. Harvey, Marc J. Sonnenfeld, David R. King, Kell M. Damsgaard, Elizabeth L. Hoop, Morgan, Lewis & Bockius, Philadelphia, Pa., for Enterra.

Irving R. Segal, Peter S. Greenberg, Robert T. Vance, Jr., Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., and Herman Sassower, Bell, Kalnick, Beckman, Klee & Green, New York City, for SGS Associates.

Stuart H. Savett, Barbara A. Podell, Kohn, Savett, Marion & Graff, P.C., Philadelphia, Pa., for Grace Wallen; Joseph Weiss, New York City, of counsel.

Gregory M. Harvey, Marc J. Sonnenfeld, Morgan, Lewis & Bockius, David R. King, Kell M. Damsgaard, Philadelphia, Pa., for James M. Ballengee.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

The above captioned cases are two related securities actions which arise from an unusual set of factual circumstances and which present some rather novel legal issues. The amended complaint in the *Enterra* case (Civil Action No. 84–2174) alleges, *inter alia*, that the defendant partnership SGS Associates and its individual partners (herein collectively referred to as SGS), which is Enterra Corporation's largest shareholder, violated various federal and state securities laws in connection with the defendants' negotiation, execution, and subsequent alleged violation of a "standstill agreement" with Enterra's Board of Directors ("the Board"). The standstill agreement provided, *inter alia*, that SGS would not purchase or acquire more than 15% of Enterra's outstanding shares and would not make any tender offers to Enterra's shareholders for the purchase of Enterra stock. Enterra's complaint also includes causes of action against SGS for fraud, breach of contract, and the currently popular allegation of a violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.* Enterra seeks, *inter alia*, permanent injunctive relief prohibiting SGS from acquiring or offering to acquire any shares of Enterra stock in violation of the standstill agreement.

SGS (which notwithstanding its standstill agreement with the Board, now desires to have the opportunity to purchase all of Enterra's outstanding shares) filed various

counterclaims against Enterra's directors and has moved for a mandatory preliminary injunction against the Board. SGS seeks an order from this Court as follows:

(1) Enjoining the Board to consider the adequacy of any proposal made by defendants to purchase shares of Enterra;

(2) Enjoining the Board, within ten (10) business days after receipt of a proposal, to disclose in writing to defendants its recommendation regarding the proposal and all of the reasons therefor;

(3) Enjoining the Board, within ten (10) business days after receipt of a proposal and if the Board recommends against acceptance of the proposal, to disclose in writing to defendants all of the reasons for such recommendation, including, without limitation, its view of the adequacy of the proposal from a financial standpoint; and

(4) Enjoining the Board, within ten (10) business days after receipt of a proposal and if the Board recommends against acceptance of the proposal, to disclose in writing to each shareholder of record the fact and terms of the proposal and its recommendation, and to allow each shareholder to decide whether to accept or reject the offer.

In support of its motion for a mandatory preliminary injunction, SGS contends that there exists a common law fiduciary duty owed by the Board to the shareholders which, notwithstanding the standstill agreement, requires the Board to (1) consider the adequacy of any SGS offer to purchase Enterra shares; (2) disclose to shareholders the facts and terms of the offer along with the Board's analysis and decision; and (3) convey the offer to the shareholders and permit the shareholders to accept or reject the SGS offer.

Subsequent to the filing of SGS' counterclaims and motion for preliminary injunction, the plaintiff in *Wallen v. Ballengee* (Civil Action No. 84–4050) filed a shareholders' derivative action against the directors of Enterra Corporation alleging, *inter alia*, that the Board breached its fiduciary duty to the corporation and shareholders by entering into the standstill agreement which restricted SGS' ability to purchase Enterra stock. Wallen also has moved for a preliminary injunction seeking relief identical to the relief sought by SGS in its motion. Wallen's motion is grounded upon the same legal propositions advanced by SGS. A consolidated argument on the motions for a preliminary injunction was held before this Court, and generally was directed to whether or not the parties seeking the injunctive relief against the Board had any reasonable probability of succeeding on the merits of the legal propositions underpinning the requested relief. Indeed, at oral argument, counsel for SGS characterized the issues presented by the motions as purely issues of law, in the nature of "summary judgment on admitted facts." (Tr. of Oral Argument at 30, 61). For the reasons which follow, this Court has determined that the motions filed by SGS and Wallen seeking a mandatory preliminary injunction against Enterra's Board of Directors must be denied.

### A. *Background*

The essential facts with respect to the issues presented are not, for the purposes of the motions for a preliminary injunction, seriously disputed. Enterra is a Pennsylvania corporation with its principal place of business in Radnor, Pennsylvania. Enterra's common stock is traded on the New York and Philadelphia stock exchanges. As of March 30, 1984, Enterra had approximately nine million shares of common stock outstanding held by approximately five thousand shareholders of record. Enterra's Board is composed of seven independent or outside directors and three management or inside directors, including its chairman and president, James Ballengee. The individual defendants in the *Enterra* case, Philip Sassower, James Goren, and Lawrence Schneider (who comprise the SGS Associates partnership) are investors with considerable experience in the field of corporate investment.

In the spring of 1982, Sassower and other members of SGS met with James Ballen-

gee, Enterra's chairman. The SGS group indicated that its members had accumulated a significant amount (nearly 5%) of Enterra's common stock, and that they desired to purchase additional Enterra shares. Apparently, SGS' purchases had generated significant market interest in Enterra stock, including the anticipation of a possible takeover bid, and the price of Enterra's common stock had increased. This rise in market price, of course, made it more expensive for SGS to acquire additional Enterra shares. At the time of the initial meeting with Ballengee, SGS did not indicate any desire to acquire control of Enterra, but rather expressed an interest in acquiring additional Enterra shares for investment purposes.

Subsequent to this meeting, the parties entered into negotiations which led to the execution of a Standstill Agreement (the Agreement) between Enterra and SGS on November 30, 1982. The Agreement was finalized only after considerable negotiation by counsel representing both parties, and after the preparation and revision of several draft agreements. The Agreement is thirty-four pages in length and provides that it shall remain in effect until November 30, 1992, subject to the occurrence of certain contingencies not applicable here. The provisions of the Agreement pertinent to the issues presently before the Court provide that, subject to certain exceptions not applicable here, SGS will not increase its holdings of Enterra voting securities to more than 15% of those outstanding; that SGS will not acquire or offer to acquire any Enterra voting securities by means of a tender offer; that SGS will not publicly suggest or announce its willingness or desire to make or have another party make such a tender offer; that SGS will not assist or participate in such an offer made by any other party, and that SGS will not recommend that any other party commence a tender offer for Enterra voting securities.

The terms of the Agreement were disclosed by Enterra in a press release issued in December of 1982, and in Enterra's 1983 and 1984 proxy statements mailed to share-holders. By February of 1983, SGS had acquired 5% of Enterra's outstanding shares, and filed a Schedule 13D with the Securities and Exchange Commission as required by 17 C.F.R. § 240.13d–1. Attached to the Schedule 13D was a copy of the standstill Agreement. The Schedule 13D stated that the Enterra shares had been acquired for the purpose of investment, and that it was the intention of SGS, subject to the terms of the Agreement, to acquire additional shares of Enterra stock. SGS filed several amendments to its Schedule 13D in 1983 and 1984, reflecting increases in its acquisitions of Enterra shares.

Towards the latter part of 1983, SGS requested Enterra's Board to amend the Agreement in some respects, notably to permit SGS to acquire greater than 15% of the outstanding shares as set forth in the Agreement. The Board declined to amend the Agreement. At this time, the market price of Enterra's shares was declining and relations between SGS and the Board deteriorated thereafter.

In February of 1984, SGS filed an amendment to its Schedule 13D which stated, *inter alia*, that it "had decided to explore other alternatives that may be available." At that time, Enterra's shares were trading at approximately $16 per share. On May 1, 1984, members of the SGS group met with Enterra's chairman and requested that the Agreement be amended to permit acquisition of Enterra shares above the 15% limit, and to permit greater participation by SGS in Enterra's management. When Enterra's chairman stated that the Board's position on amending the Agreement was not favorable, SGS presented him with a letter dated May 1, 1984 which stated, *inter alia:*

The SGS Group, with the approval of the Enterra Corporation, hereby offers to acquire for cash any and all outstanding shares of Enterra at a price of $21 per share. This offer is subject to the approval of the Board of Enterra ... and execution of an agreement incorporating terms and conditions that would be mu-

tually satisfactory to the SGS Group and Enterra.

The letter requested a response by May 9, 1984. On May 3, 1984, five independent and three management directors of Enterra's Board participated in a meeting and considered the SGS proposal. The Board considered the proposal and declined to approve the offer or to amend the Agreement. That afternoon, after counsel for SGS was informed of the Board's decision, SGS filed an amendment to its Schedule 13D which included a copy of the May 1, 1984 letter offering to acquire all of Enterra's shares. There was an immediate disruption in the trading market for Enterra stock, causing the New York Stock Exchange to halt trading of Enterra shares that day and causing a delay in the opening of trading the following day. On May 4, 1984, Enterra filed the present action against SGS. On May 10, 1984, the entire Board of Enterra met at its regularly scheduled meeting, together with counsel and Enterra's financial advisor, Merrill Lynch. The proposal submitted by SGS again was considered and discussed. Merrill Lynch advised the Board that the $21 per share price offered by SGS was inadequate from a financial point of view. The Board determined that it was not in the best interests of the corporation or the shareholders to accept the SGS proposal at that time or to amend the Agreement.

Currently, SGS owns close to 15% of Enterra's outstanding shares. It is undisputed that if SGS made an offer to purchase all of Enterra's shares directly to Enterra's shareholders, SGS would be in violation of the Agreement. Absent the Agreement, of course, SGS would be free (as is any other party) to make a tender offer for all of Enterra's shares. As of this date, SGS has not made any such offer directly to Enterra's shareholders, presumably because it seeks to avoid the risk of incurring liability for breach of the Agreement. SGS and Wallen now contend, however, that there exists a fiduciary duty on the part of the Board, notwithstanding the Agreement negotiated by SGS, to consider the adequacy of any SGS offer; to relay the terms of the offer and the Board's decision to all shareholders; and most important, to actually *convey* the offer to the shareholders and provide the means by which any shareholder can accept the offer and sell his or her stock to SGS. SGS and Wallen ask this Court to order the Board to do, on *behalf* of SGS, that which SGS contractually obligated itself *not* to do—that is, to make a tender offer for the purchase of all Enterra stock. In effect, granting the preliminary injunction would enable SGS to "have its cake and eat it, too," in that SGS would be permitted to effectively convey its tender offer to Enterra's shareholders, but since the offer would be extended through the Board and not made directly by SGS, SGS apparently would avoid violating the terms of the Standstill Agreement it signed with the Board.

### B. *Preliminary Injunction Standards*

In order to obtain a preliminary injunction, the movant must (1) "make a strong showing that it is likely to prevail on the merits" and (2) "show that without such relief [the movant] would be irreparably injured." *Klitzman, Klitzman & Gallagher v. Krut*, 744 F.2d 955, 958–59 (3d Cir.1984). While the burden rests upon the moving party to make these two requisite showings, the district court also must take into account, where relevant, the possibility of harm to other interested persons resulting from the grant or denial of injunction, as well as the public's interest in the matter. *Id; see Continental Group, Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351, 356–57 (3d Cir.1980); *Constructor's Association of Western Pennsylvania v. Kreps*, 573 F.2d 811, 814–15 (3d Cir.1978); *Oburn v. Shapp*, 521 F.2d 142, 147 (3d Cir.1975); *Regional Scaffolding & Hoisting Co., Inc. v. City of Philadelphia, et al*, 593 F.Supp. 529, 534 (E.D.Pa.1984). The Third Circuit has emphasized that *both* the likelihood of success on the merits of the legal claim and irreparable harm must be demonstrated by the party seeking the injunction, and that a failure by the moving party to satisfy *either* of these two prereq-

uisite showings "must necessarily result in the denial of the preliminary injunction." *In Re Arthur Treacher's Franchisee Litigation*, 689 F.2d 1137, 1143 (3d Cir.1982). *See also Moteles v. University of Pennsylvania, et al*, 730 F.2d 913 (3d Cir.1984). In deciding a motion for a preliminary injunction, the district court has broad discretion, since its task involves "a delicate balancing of the probabilities of ultimate success at the final hearing with the consequences of immediate irreparable injury that possibly could flow from the denial of preliminary relief." *Klitzman, Klitzman & Gallagher v. Krut*, 744 F.2d at 958; *Continental Group, Inc. v. Amoco Chemicals Corp.*, 614 F.2d at 357.

■ The movants herein have requested this Court to enter a *mandatory* preliminary injunction against the Board. It is well-settled that "[t]he power to issue a preliminary injunction, especially a mandatory one, should be sparingly exercised," *United States v. Spectro Foods Corporation*, 544 F.2d 1175, 1181 (3d Cir.1976), and the Third Circuit has cautioned that "when the preliminary injunction is directed not merely at preserving the status quo but, as in this case, providing mandatory relief, the burden on the moving party is particularly heavy." *Punnett v. Carter*, 621 F.2d 578, 582 (3d Cir.1980). *See also United States v. Price*, 688 F.2d 204, 212 (3d Cir.1982) (mandatory injunctions should be used sparingly); *Sovereign Order of St. John of Jerusalem Knights of Malta v. Messineo*, 572 F.Supp. 983, 988–89 (E.D.Pa.1983) ("Mandatory preliminary injunctions, which seek to alter the status quo, are normally granted only in those circumstances where the exigencies of the situation demand such relief and the facts and the law are clearly in favor of the moving party.").

## C. *The Movants' Legal Claims*

The implication of the legal theory advanced in support of the motions for a preliminary injunction is that despite the existence of a standstill agreement between a corporation and a substantial shareholder, if at any time the contracting shareholder decides to attempt to acquire an amount of the corporation's stock in excess of the agreed-upon limit, the corporation, acting through its board of directors, must nevertheless consider the investor's offer, advise the shareholders of the offer, and give the shareholders the opportunity to accept or reject the offer. The movants' claim thus calls into question whether, notwithstanding the existence of a standstill agreement limiting the percentage of the corporation's stock which the investor may acquire, a board of directors has a fiduciary duty to advise the shareholders of any offer received from the investor to purchase the corporation's stock in excess of the limitation provided in the agreement, and to give the shareholders the opportunity to accept or reject the offer. Before addressing this issue, it is appropriate to review some basic principles of corporate law.

### 1. *Directors' Fiduciary Duty and the Business Judgment Rule*

■ In Pennsylvania, as in most jurisdictions, officers and directors of a corporation stand in a fiduciary relation to the corporation, and must discharge the duties of their positions in good faith and with the diligence, care, and skill which ordinarily prudent persons would exercise under similar circumstances. 15 Pa.Cons.Stat.Ann. § 1404 (Purdon's Supp.1984); *Brown v. Presbyterian Ministers' Fund*, 484 F.2d 998, 1004 (3d Cir.1973); *United States v. Gleneagles Investment Co., Inc.*, 565 F.Supp. 556, 589 (M.D.Pa.1983); *Bellis v. Thal*, 373 F.Supp. 120 (E.D.Pa.1974); *Wolf v. Fried*, 473 Pa. 26, 373 A.2d 734 (1977). These fiduciary obligations have sometimes been described as the duty of care, i.e., the responsibility of the fiduciary to exercise the care that a reasonably prudent person in a similar position would use under similar circumstances, and the duty of loyalty, i.e., the duty not to take advantage of the fiduciary relationship by engaging in self-dealing. *See Norlin Corporation v. Rooney, Pace Inc., et al.*, 744 F.2d 255, 264 (2d

Cir.1984); *cf. Seaboard Industries, Inc. v. Monaco,* 442 Pa. 256, 276 A.2d 305 (1971).

■ It is the directors, and not the shareholders, who must manage the business affairs of the corporation, and the directors of a corporation "have the power to bind [the corporation] by any contract which is within its express or implied powers, and which in their judgment is necessary or proper in order to carry out the objectives for which the corporation was created ... without consulting with or obtaining the consent of the stockholders." 2 W. Fletcher *Cyclopedia of the Law of Private Corporations,* § 505, pp. 515–16 (rev. perm. ed. 1981). *See also, Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 343, 56 S.Ct. 466, 481, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); *Matter of Penn Central Transportation Co.,* 596 F.2d 1155, 1166 (3d Cir.1979); *Severance v. Heyl & Patterson,* 123 Pa.Super. 553, 187 A. 53 (1936); *Auerbach v. Bennett,* 47 N.Y.2d 619, 629–31, 419 N.Y.S.2d 920, 393 N.E.2d 994 (1979).

■ It is an axiomatic principle of corporate law that "[c]ourts are reluctant to interfere in the internal management of a corporation" at the behest of a shareholder, *Wolf v. Fried,* 373 A.2d at 734, and that "[shareholders] cannot secure the aid of a court to correct ... mistakes of judgment on the part of the [directors]." *Ashwander v. Tennessee Valley Authority,* 297 U.S. at 343, 56 S.Ct. at 481 (Brandeis, J., concurring). In discharging their fiduciary duties to the corporation, the directors are protected against unwarranted interference from complaining shareholders by the "business judgment rule". The business judgment rule provides that directors are not liable to the corporation for mistakes in judgment, whether those mistakes are characterized as mistakes of fact or mistakes of law. *See Briggs v. Spaulding,* 141 U.S. 132, 11 S.Ct. 924, 35 L.Ed. 662 (1891); *Cramer v. General Telephone & Electronics Corp.,* 582 F.2d 259, 274–75 (3d Cir.1978); *Selheimer v. Manganese Corporation of America,* 423 Pa. 563, 224 A.2d 634 (1966). If the shareholders conclude

that the judgment of the directors in pursuing a particular course of action is not sound, their remedy lies in the replacement of the directors through the corporate voting process—they may vote the management out. *See* M. Lipton, *Takeover Bids and the Targets' Boardroom,* 35 Bus.Law. 101, 116 (1979).

One commentator recently has described the business judgment rule as follows:

Courts review the decisions of corporate directors under the business judgment rule. According to the rule, directors' decisions are presumed to be based on sound business judgment; this presumption can be rebutted only by a showing of fraud, bad faith, or gross overreaching. Courts are willing to defer to directors because it is the board's duty to manage the affairs of the corporation and because courts often consider themselves ill-equipped to second-guess business decisions. The presumption of sound business judgment allows the directors to prevail whenever they can articulate a rational, unselfish business purpose for their actions.

Note, *Protecting Shareholders Against Partial and Two-Tiered Takeovers: The "Poison Pill" Preferred,* 97 Harv.L.Rev. 1964, 1969 (1984) (footnotes omitted) (hereinafter cited as "Harvard L.Rev. Note"). It has been held that the presumption of good faith and sound judgment afforded by the business judgment rule is heightened where the majority of the board consists of independent, outside directors and where the directors have obtained and considered expert legal and business advice. *Panter v. Marshall Field & Co.,* 646 F.2d 271, 277, 294 (7th Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981). *See also* J. Bartlett & C. Andrews, *The Standstill Agreement: Legal and Business Considerations Underlying a Corporate Peace Treaty,* 62 B.U.L.Rev. 143, 150 & n. 25 (1982).

■ If it is established that a board of directors has acted in fraud, bad faith, or self-interest, the presumption of the business judgment rule does not apply, and the

directors bear the burden of showing that the transaction was fair and served a legitimate corporate purpose. Harvard L.Rev. Note, *supra*, 97 Harv.L.Rev. at 1969; *Wolf v. Fried*, 373 A.2d at 736 n. 8. However, as the Third Circuit has noted, "by the very nature of corporate life a director has a certain amount of self-interest in everything he does," and that "[the desire to retain] control [of the corporation] is always arguably a motive in any action taken by a director." *Johnson v. Trueblood*, 629 F.2d 287, 292 (3d Cir.1980), *cert. denied*, 450 U.S. 999, 101 S.Ct. 1704, 68 L.Ed.2d 200 (1981). Accordingly, in order to overcome the presumption of the business judgment rule, "the plaintiff must make a showing that the sole or primary motive of [the directors] was to retain control." *Id.* at 293 (applying Delaware law). *See also Panter v. Marshall Field & Co.*, 646 F.2d at 294; *Heit v. Baird*, 567 F.2d 1157, 1161 (1st Cir.1977); *Warner Communications, Inc. v. Murdoch*, 581 F.Supp. 1482, 1491 (D.Del.1984). Even those commentators who disagree with the application of the rule's presumption in certain circumstances agree that "[c]urrent case law ... places the burden on the plaintiff to show that management's sole or primary purpose [in taking the challenged action] was retention of control." Note, *The Standstill Agreement: A Case of Illegal Vote Selling and Breach of Fiduciary Duty*, 93 Yale L.J. 1093, 1110 n. 77 (1984) (hereinafter cited as "Yale L.J. Note"). *See also* Bartlett & Andrews, *supra*, 62 B.U.L.Rev. at 148. Although there appear to be no reported Pennsylvania decisions applying the business judgment rule to "defensive" actions taken by corporate directors in anticipation of or in opposition to a takeover bid, there is no reason to believe (and the parties do not contend) that the Pennsylvania Supreme Court would not follow the prevailing interpretation of the business judgment rule in such circumstances.

■ A "target" corporation's decision to accept or resist a takeover bid (generally manifested as a tender offer) necessarily rests with the board of directors, since it is the directors, and not the shareholders, who are best able to evaluate the numerous and often complex financial factors which must be considered in determining whether the takeover proposal serves the best interests of the corporation. *See generally* Lipton, *supra*, 35 Bus.Law 101 (1979). *See also* W. Steinbrink, *Management's Response to the Takeover Attempt*, 28 Case. W.L.Rev. 882, 891 (1978). The wave of corporate takeover attempts in recent years has spawned sufficient litigation to establish that the fiduciary duty of corporate directors "to act in the best interests of the corporation's shareholders ... requires the directors to attempt to block takeovers that would [in their judgment] be harmful to the target company." Harvard L.Rev. Note, *supra*, 97 Harv.L.Rev. at 1968. *See Panter v. Marshall Field & Co.*, 646 F.2d at 299 (directors are obliged to oppose tender offers deemed to be "detrimental to the well-being of the corporation even if that [opposition] is at the expense of the short term interests of individual shareholders."); *Treadway Companies, Inc. v. Care Corp.*, 638 F.2d 357, 381 (2d Cir.1980); *Heit v. Baird*, 567 F.2d at 1161 ("management has not only the right but the duty to resist by all lawful means persons whose attempt to win control of the corporation, if successful, would harm the corporate enterprise."); *cf. Norlin Corp. v. Rooney, Pace Inc., et al.*, 744 F.2d at 264, 266 (business judgment rule "affords directors wide latitude in devising strategies to resist unfriendly advances," and where the directors determine that the interests of the corporation and its shareholders might be jeopardized, they may take any fair and reasonable actions necessary to thwart an acquisition attempt).

Courts applying the business judgment rule have upheld a wide variety of sometimes drastic defensive tactics undertaken by a target company to prevent a takeover bid, including the sale of large blocks of treasury stock to "friendly" purchasers; acquisitions designed to make the target less attractive or create antitrust obstacles for the offeror; and the institution of antitrust or securities litigation by the target

company against the offeror in an effort to block the takeover. Bartlett & Andrews, *supra,* 62 B.U.L.Rev. at 148–50 (citing cases). It is well-established that such "[d]efensive tactics are illegitimate only if a target's management fails to exercise its business judgment and engages in such tactics for the primary purpose of entrenchment." *Warner Communications, Inc. v. Murdoch,* 581 F.Supp. at 1491.

### 2. *The Validity of the Standstill Agreement*

With these basic principles of corporate law in mind, the Court will now consider the movants' particular legal claims. Although SGS understandably is reluctant to ask this Court to declare that the standstill agreement which SGS sought, negotiated, and signed with Enterra is invalid and may be disregarded, plaintiff Wallen contends that the Board breached its fiduciary duty to the shareholders in entering into the Agreement, which by its terms restricts SGS' rights to purchase Enterra stock. Wallen contends that a board of directors cannot agree to limit its duty to convey all offers received by the board to purchase the corporation's stock to the shareholders by utilizing the "defensive" mechanism of a standstill agreement.

The use of standstill agreements is a relatively recent corporate development which has received generally favorable reactions from the commentators. *See generally,* Bartlett & Andrews, *supra,* 62 B.U. L.Rev. 143 (1982); K. Bialkin, *The Use of Standstill Agreements in Corporate Transactions,* 373 P.L.I. 91, 94–108 (1981); A. Fleischer & D. Sternberg, *Corporate Acquisitions,* 12 Rev.Sec.Reg. 937 (1979). This Court is advised that standstill agreements have been reached between the board of directors and a substantial investor in approximately fifty publicly-traded corporations in the last several years. The standstill agreement is "in essence, a corporate peace treaty, designed to inject a degree of stability, certainty, and cooperation into the relationship between an issuer and a major investor." Bartlett & An-

drews, *supra,* 62 B.U.L.Rev. at 144. The typical standstill agreement serves to relieve the antagonism, suspicion, and hostility which, in this era of corporate takeover bids, often exists between a corporation and a substantial shareholder. The essential provision of a standstill agreement is a limitation, usually expressed as a percentage figure, on the shareholder's holding of the corporation's stock, and generally prohibits the shareholder from making any tender offers for the corporation's stock during the terms of the agreement. Such agreements may also restrict the shareholders' ability to transfer the corporation's shares by affording the corporation a right of first refusal. By entering into such agreements, the directors ensure that the relationship between the corporation and an investor who has been purchasing significant blocks of stock will be clearly governed and defined. Such agreements also serve to avoid the unsettling impact on the corporation's business and workforce which could result from anticipation on the part of customers, shareholders, and employees that a takeover bid may be imminent. The corporation may seek to avert a costly control fight with the contracting shareholder by arriving at a negotiated understanding in advance of an anticipated bid for control. The corporation may also seek to "lock up" a significant block of stock with a "friendly" shareholder in the event that a third party attempts a takeover that the board believes is not in the corporation's best interest to accept.

The contracting shareholder, in return, receives assurance that the corporation will not oppose its acquisitions up to the specified limit. Often an investor's substantial purchases of the corporation's stock initially will cause the market price of the stock to rise, and it becomes more costly for the investor to acquire additional stock. The investor may therefore seek to clearly set forth its "investment-only" intentions in order to dispel any anticipation of a tender offer and reduce the market price for the corporation's stock. In entering into a standstill agreement, the investor may seek input into management decisions, and may

also obtain certain valuable securities registration rights from the corporation. *See* Bartlett & Andrews, *supra,* 62 B.U.L.Rev. at 144–46; Yale L.J. Note, *supra,* 93 Yale L.J. at 1094–97 & n. 11. Because the primary purpose of a standstill agreement usually is to create a stable and "absolutely certain" relationship between the contracting parties, the "situation … calls for a very formal, binding, and judicially enforceable contract." Yale L.J. Note, *supra,* 93 Yale L.J. at 1093 n. 78.

■ The application of the business judgment rule discussed above leads one to conclude that where "a valid corporate purpose [for executing a standstill agreement] exists and if management has consulted appropriate legal and business advisors before concluding the agreement," courts should not "second-guess management's judgment that the corporation would benefit from an extended period of corporate peace." Bartlett & Andrews, *supra,* 62 B.U.L.Rev. at 150. *See also,* Yale L.J. Note, *supra,* 93 Yale L.J. at 1097, 1112 n. 86 (standstill agreements "are useful in regulating relations between management and a substantial shareholder" and may bring "order and reliability to a relationship that was previously ambiguous and uncertain."). This Court's attention has not been called to any decision challenging the general validity of standstill agreements or the directors' right (indeed, their duty) to execute such an agreement if in their judgment the best interests of the corporation are served thereby. Although this Court would be inclined to challenge the validity of any provision in a standstill agreement requiring the shareholder to vote with management on any material matter, *see* Yale L.J. Note, *supra,* 93 Yale L.J. 1093 (1984), in this case the Agreement's voting provisions are not at issue.

As noted above, no court has determined or even suggested that a standstill agreement such as the one negotiated by Enterra and SGS constitutes a breach of the directors' fiduciary duty to the corporation and the shareholder. In *General Portland, Inc. v. Lafarge Coppee S.A.,* Nos. C.A. 3–81–1060D and C.A. 3–81–1082D, slip op., (N.D.Tex.1981), *reprinted in* Fed.Sec. L.Rep. (CCH) (¶¶ 99, 148) [1982–83 Transfer Binder at 95, 537], the United States District Court for the Northern District of Texas issued an injunction prohibiting an anticipated tender offer by the defendant on the ground that the corporation was likely to succeed on the merits of its claim that in making its tender offer the defendant would breach a valid, binding, and enforceable standstill agreement. *Id.* at 95, 542.

In *Biechele, et al. v. Cedar Point, Inc., et al,* 747 F.2d 209 (6th Cir.1984), the court held that as a matter of law a standstill agreement between the defendant corporation and a "friendly" third party (Pearson) did not constitute an unlawful manipulative device under the federal securities laws, and stated

The standstill agreement fixed no price for any purchase of Cedar Point stock by Pearson or anyone else… There were no competing bidders for the minority interest in Cedar Point which Pearson sought. While the agreement had the practical effect of … conditionally ensuring continued control by Cedar Point's board of directors, it would not inhibit third party bidders if they were otherwise interested… The effect of the agreement would be to encourage rather than inhibit, competitive bidding.

*Biechele,* 747 F.2d at 216. *Compare Gearhart Industries, Inc. v. Smith International, Inc.,* 741 F.2d 707 (5th Cir.1984) (court appeared to assume, without detailed analysis, the general validity of an alleged oral standstill agreement).

■ As noted above, the actions of a board of directors in managing the affairs of the corporation are governed by the business judgment rule. In the present case, the affidavit submitted by Enterra's chairman sets forth numerous valid corporate purposes supporting the directors' negotiation and approval of the Agreement, which are primarily related to the potential adverse effect upon the corporation which SGS' initial significant purchases of Enterra's stock may have generated. According

to the affidavit, the Board, acting in part upon the advice of counsel and Enterra's financial advisors, determined that it was in the best interests of the corporation to execute the Agreement because the stability created by the Agreement would provide numerous benefits to the corporation, including the retention (and recruitment) of key employees; allaying the "takeover" concerns of (and stabilizing relations with) various suppliers, customers, and lenders; settling the trading market for Enterra stock; and preserving the Board's ability to sell the corporation (if at all) at a time and in a manner which is in the best interests of the corporation and all shareholders. At the time the Agreement was negotiated and executed, SGS had not indicated a desire to obtain control of the corporation, nor is there any indication that any third party has at any time been interested in acquiring the corporation. Enterra's shareholders were promptly informed of the existence and substance of the Agreement. Although, as with all actions taken by a board of directors, retention of control arguably was *a* motive for entering into the Agreement, it is clear that the primary purpose of the Board (which, as noted, includes a majority of independent directors) was to "create a stable, certain, and cooperative relationship between management a substantial shareholder." Yale L.J. Note, *supra*, 93 Yale L.J. at 1096–97. The Board thereafter declined to amend the Agreement to permit SGS to offer to purchase all the shareholders' stock because the Board, in its judgment, considered the offer price financially inadequate. These undisputably are valid business reasons for entering into and declining to amend the Agreement, and, accordingly, this Court has determined that the movants have not demonstrated any reasonable likelihood of success on the merits of their claim that the Board breached its fiduciary duty to the corporation or the shareholders by executing the Agreement with SGS.

### 3. *Alleged Duty to Convey All Offers to Shareholders*

As noted above, the movants contend that, notwithstanding the provisions of the standstill Agreement there exists a common law fiduciary duty to (1) consider the adequacy of SGS' offer to buy all of Enterra's shares; (2) communicate that offer to Enterra's shareholders, together with the Board's decision to approve or disapprove the offer and its reasons therefore; and (3) provide some means by which each shareholder actually may accept SGS' offer and sell their shares to SGS. A necessary implication of the movants' claim is that the Agreement negotiated by SGS cannot relieve the Board of its obligation to communicate *and convey* SGS' offer to the shareholders.

At the outset, it appears that SGS may not have standing to assert the *shareholders'* alleged right to be apprised of and to receive the offer presented by SGS to the Board. An alleged breach of fiduciary duty on the part of the directors which is asserted on behalf of all shareholders or the entire corporation (whereby each shareholder suffers an indirect loss in common with other shareholders) must be maintained as a derivative action and cannot be asserted by individual shareholders in their own right. *Davis v. United States Gypsum Co.*, 451 F.2d 659, 662 (3d Cir.1971); *Fitzpatrick v. Shay*, 314 Pa.Super. 450, 455–56, 461 A.2d 243, 246 (1983). In *Gearhart Industries, Inc. v. Smith International, Inc.*, 741 F.2d 707 (5th Cir.1984), the court noted that a substantial shareholder who was attempting to purchase a controlling block of the corporation's stock had no standing to assert a breach of fiduciary duty claim against the directors for various actions taken by the directors to oppose the shareholder's takeover bid. The court stated that such claims must be brought by way of a derivative action. 741 F.2d at 721. However, since plaintiff Wallen has brought a derivative action and seeks the same injunctive relief as SGS, this Court will address the merits of their claims.

For the purposes of the motions for a preliminary injunction, it is not disput-

ed that the Board considered the adequacy of the SGS offer (and, necessarily, SGS' request to amend the Agreement), and at oral argument counsel for SGS did not contend that the Board had not properly considered the proposal (Tr. of Oral Argument at 61). The affidavit submitted by the chairman of Enterra's Board states that the SGS offer was considered on two occasions by the Board, and, relying in part upon the advice of Enterra's financial advisor (Merrill Lynch) that the offer was financially inadequate, the Board determined that it was not in the best interests of the corporation to accept the proposal or modify the Agreement. Therefore, assuming that the Board had a fiduciary obligation to the corporation and shareholders to consider in good faith the adequacy of the SGS proposal, it is clear that the Board fulfilled that responsibility. The movants do not contend that the Board's refusal to approve the SGS offer was wrongful or constituted any breach of duty.

The movants also claim that after deciding to reject the SGS proposal, the Board had a fiduciary responsibility to *inform* all shareholders of the terms of the SGS offer and the reasons for the Board's decision not to approve the offer. Ordinarily, of course, an offeror which has been rejected by the board of directors in its efforts to acquire control of the corporation is free to communicate its offer to any and all shareholders by tender offer or otherwise. Thus, ordinarily, there is no need for the directors to disclose the terms of any rejected offer or the substance of any negotiations because the offeror has unfettered access to the shareholders. However, since SGS is restrained by the terms of its Agreement with the Board from approaching the shareholders with an offer to purchase their shares, the movants contend that the Board is under a fiduciary obligation to disclose the terms of the offer (and the Board's decision) to the shareholders. The movants have cited no authority under federal or state law in support of their claim that a board of directors must disclose to all shareholders every offer to purchase all the corporation's shares.

Recently, the Third Circuit has held that there exists no obligation under Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)), and Rule 10b–5 (17 C.F.R. § 240.10b–5) for a "target" corporation to disclose the status of offers or negotiations between the board and a "hostile suitor" attempting to take over the corporation unless and until an "agreement in principle" (e.g., to transfer control or effect a merger) has been reached. *Greenfield v. Heublein, Inc., et al.*, 742 F.2d 751, 756–57 (3d Cir.1984); *see also Staffin v. Greenberg*, 672 F.2d 1196 (3d Cir.1982). No such agreement, of course, was reached in this case. Under the Williams Act, 15 U.S.C. § 78n(d) & (e), Enterra would be required to take certain actions *if* SGS had made a tender offer bid to all shareholders to acquire Enterra's outstanding shares. However, SGS has not made any tender offer, and the provisions of the Williams Act are inapplicable. Indeed, the movants do not contend that the provisions of the Williams Act (or any federal or state securities statute) provide the legal basis of their claim for relief.

Under Pennsylvania law, a corporate board of directors must submit a proposal to merge or consolidate to the shareholders for approval only if the board has approved the proposal. 15 Pa.Cons.Stat.Ann. § 1902 (Purdon's Supp.1984). In this case, of course, the Board has not approved any SGS proposal. Counsel for Enterra has cited a number of decisions holding that "[d]irectors are under no [fiduciary] duty to reveal [to shareholders] every approach by a would-be acquiror or merger partner." *Panter v. Marshall Field & Co.*, 646 F.2d at 296. *See also Pogostin v. Rice*, 480 A.2d 619 (Del.Supr.Ct.1984) (directors' refusal to accept tender offer at premium above market price per share, and refusal to negotiate with offeror, does not establish a prima facie case of breach of fiduciary duty). At least one commentator has stated that there is no obligation on the part of directors to pass on to shareholders the right to accept or reject takeover offers

submitted to and rejected by the board. Lipton, *supra*, 35 Bus.Law. at 116.

■ The weight of all these authorities strongly suggests that the Board was under no duty imposed by any federal, state, or common law standard to communicate the terms of the SGS proposal (and the Board's decision to reject it) to Enterra's shareholders. Under the peculiar circumstances of this case, wherein SGS has bound itself not to present an offer to purchase the corporation's stock in excess of the limit provided for in the Agreement directly to the shareholders, it may well be that there was no obligation on the part of the Board to inform the shareholders of SGS' proposal and the Board's reasons for rejecting it. However, assuming without deciding that the Board was obliged, under the circumstances of this case, to convey this information to the shareholders, the movants' request that this Court order the Board to do so has been rendered moot by Enterra's publication of its 1984 Second Quarterly Report (sent to all shareholders), wherein Enterra's Chairman briefly describes the SGS proposal, the Board's reason for rejecting it, and the status of this litigation.

It is apparent that much of the relief requested by the movants in their motions for a preliminary injunction (i.e., that the Board consider the adequacy of the SGS proposal, and that the Board disclose the terms of the proposal and the basis for its decision to reject it) is no longer at issue. However, although the movants rely heavily upon the shareholders' alleged "right to know" of the Board's determination of the SGS proposal, clearly the movants' primary interest lies in obtaining an order from this Court which would effectively convey SGS' offer to Enterra's shareholders without fear that SGS will incur liability for breach of the standstill agreement. The movants contend that the Board's consideration and disclosure of the SGS proposal are not sufficient, and that the Board itself is obliged to extend, on behalf of SGS, the SGS offer to all of Enterra's shareholders and provide a means by which each shareholder can accept or reject the SGS offer. The movants contend that as an absolute principle of corporate law (and notwithstanding any agreements to the contrary) no board of directors can fail to *convey* to the shareholders an offer received by the board to purchase the shareholders' stock.

■ The movants have not cited, nor has this Court discovered, any federal or state statute (or any common law authority) which requires the board of directors to *convey* to all shareholders (and permit them to accept or reject) any offer for the purchase of all the shareholders' stock where, as in the present case, the offeror and the corporation have entered into a standstill agreement limiting the percentage of the corporation's stock which the offeror can acquire. As noted above, it may well be that the Board is not even obliged to simply inform the shareholders of the offer. Accordingly, this Court therefore has determined at this stage of the proceedings that no reasonable likelihood of success on the merits of the movants' legal claim has been demonstrated.

This Court has concluded, for all of the reasons set forth above, that the movants have not demonstrated any reasonable likelihood of success on the merits of their legal claims. The motions for preliminary injunctive relief, therefore, must be denied on this basis alone.

D. *Irreparable Injury and the Equity Factors*

■ As heretofore pointed out, in addition to demonstrating a likelihood of success on the merits of its legal claim, a party seeking a preliminary injunction also must show that absent the relief requested, it will suffer irreparable injury. In this case, the movants have not demonstrated that they would suffer any irreparable injury, absent injunctive relief, as a result of the Board's alleged breach of fiduciary duty. The Third Circuit has held that a district court should not "exercise the delicate power of injunctive relief" absent a "clear showing of immediate irreparable injury." *Ammond v. McGahn*, 532 F.2d

325, 329 (3d Cir.1976). An alleged ongoing financial loss cannot support a claim for preliminary injunctive relief, because "the injury must be of a peculiar nature, so that compensation in money alone cannot atone for it." *In Re Arthur Treacher's Franchisee Litigation,* 689 F.2d at 1146. The movants have not shown that any injury suffered as a result of the Board's actions could not ultimately be compensated in damages. In the context of shareholder derivative suits, courts have refused to grant injunctive relief to shareholders who allege that actions taken by the directors have deprived them of an opportunity to accept a tender offer, *see FMC Corp. v. R.P. Scherer Corp.,* 545 F.Supp. 318, 322 (D.Del.1982), or who allege that actions taken by the Board have diminished the value of their holdings, *see Northwest Industries, Inc. v. B.F. Goodrich Co.,* 301 F.Supp. 706, 711 (N.D.Ill.1969), on the ground that any financial injury ultimately suffered by the shareholders can be adequately compensated by a damages award.

■ Furthermore, the Court has considered the interest of third parties and the public in the grant or denial of the requested injunctive relief, and has determined that the equities clearly weigh in favor of denying the requested injunction. As noted above, standstill agreements have generally been recognized as valid contracts for achieving a measure of stability between a corporation and a substantial investor, and many such agreements are currently in effect and presumed to be valid and binding. If this Court were to grant the relief requested by the movants, the validity and enforceability of all such agreements would be cast into doubt. The resultant disruption of the relations between corporations and their major shareholders, as well as the possible disruption of the trading market for securities of those corporations which have entered into such agreements, clearly would not be in the best interests of the parties to those agreements or to the public.

*Conclusion*

For all of the reasons set forth above, this Court has determined that Wallen and SGS have failed to satisfy the burden necessary to justify the issuance of mandatory injunctive relief. The movants have failed to demonstrate any reasonable likelihood of success on the merits of their legal claims, and have failed to demonstrate the immediate threat of irreparable injury necessary to sustain the grant of a preliminary injunction. Moreover, the Court has determined that the interests of third parties and the public would not be well served by granting the requested injunctive relief. Accordingly, the motions for a preliminary injunction filed by defendant SGS in the *Enterra* case, and by plaintiff Wallen in the *Wallen* case, must be denied.