[No. H001017. Sixth Dist. Oct. 22, 1986.]

LIN ELDRIDGE, Plaintiff and Appellant, v.
TYMSHARE, INC. et al., Defendants and Respondents.

## COUNSEL

Khourie & Crew, Eugene Crew, Timothy F. Perry and Linda J. Margolies for Plaintiff and Appellant.

Douglas M. Schwab, Charles F. Robinson, Heller, Ehrman, White & McAuliffe, Marvin D. Morgenstein, Morgenstein, Ladd & Jubelirer, Veryl L. Riddle, Timothy R. Cappel, Gary S. Godwin and Bryan, Cave, McPheeters & McRoberts for Defendants and Respondents.

## OPINION

**BRAUER, J.**—This is an action by disappointed shareholders of Tymshare, Inc., who sold their stock at a loss shortly before their company announced a merger agreement which would have yielded to them a higher price per share. They allege that Tymshare and its directors breached fiduciary duties to them by 1) failing to make public disclosure of the merger negotiations, and 2) negligently and for an improper purpose rejecting certain purchase offers in the course of the negotiations. Judgment of dismissal was entered in favor of all corporate and individual defendants following an order sustaining their demurrer without leave to amend.

We find for reasons set forth below that the court's order was an abuse of discretion with respect to certain allegations of breach of fiduciary duty. Except to that limited extent, we affirm the judgment.

### FACTS

 On appeal from a judgment based upon an order sustaining a demurrer, we accept as true all allegations of material facts properly pleaded in order to determine whether the complaint is sufficient. (*Garrett* v. *Coast & Southern Fed. Sav. & Loan Assn.* (1973) 9 Cal.3d 731, 734 [108 Cal.Rptr. 845, 511 P.2d 1197, 63 A.L.R.3d 39].) Accordingly our factual summary is taken from allegations contained in plaintiff's first amended complaint.[1]

Tymshare is a California corporation which primarily sells time-sharing services and operates a national and international computer network. Its

---

[1]Plaintiff Lin Eldridge, representing himself and others similarly situated, will hereafter be referred to as Eldridge. Tymshare, Inc. and its defendant directors will be referred to collectively as Tymshare. The issue has not been raised as to whether this action properly should have been brought as a derivative suit on behalf of the corporation. We express no opinion regarding the propriety of Eldridge's chosen form of action.

stock is listed and traded on the New York Stock Exchange. McDonnell Douglas Corporation (McDonnell) is a major aerospace company. It is also engaged in computer and data processing services through its Microdata Corporation unit and its time-sharing company, McDonnell Douglas Automation Company.

On or about November 18, 1983, Tymshare and McDonnell began discussions for the purchase of Tymshare by McDonnell. McDonnell was seeking to expand its data processing and time-sharing services and would be able to provide Tymshare with much-needed cash and additional management.

On or about November 21, 1983, Eldridge purchased 2,000 shares of Tymshare stock at a price of $26.25 per share.

A week later, on November 28, McDonnell and Tymshare reached an agreement in principle, which was announced publicly. The agreement provided that McDonnell would purchase Tymshare's stock for $31 per share cash or for shares of McDonnell stock worth $32 per share. The agreement was to be finalized by December 23, 1983. In the meantime McDonnell would be allowed to conduct a detailed financial analysis of Tymshare. If this revealed serious deficiencies, McDonnell would have the option to renegotiate or withdraw from the agreement altogether.

On or about December 19, 1983, McDonnell withdrew from the agreement and merger discussions were terminated. The withdrawal and termination were publicly announced, following which the price of Tymshare stock went into a decline.

Sometime after this public announcement, Tymshare and McDonnell resumed merger negotiations and eventually reached a new agreement in principle whereby McDonnell was to purchase Tymshare at a cash price of $25 per share. This agreement was made public on February 27, 1984, and was consummated several months later.

In between the December announcement that merger negotiations had been discontinued and the February announcement of a new tentative agreement at $25 per share, Eldridge sold his stock at less than $25 per share. He claims that he did so in reliance on the December announcement. Had he known that negotiations had resumed, he would not have sold. Furthermore, he alleges on information and belief that during the resumed negotiations Tymshare's directors rejected various offers by McDonnell for over $25 per share, with an improper motive, namely to retain control, and in negligent reliance on inaccurate financial statements.

All of Eldridge's various allegations are brought under the general rubric of breach of fiduciary duty. For our purposes we have divided the allegations into two groupings: 1) that the directors failed to disclose material information, and 2) that the directors rejected certain tender offers, acting contrary to the best interests of the corporation. We now examine the sufficiency of each of these.

## DISCUSSION

### 1. *Failure to Disclose the Resumption of Merger Negotiations.*

Eldridge claims that Tymshare, once having announced that the McDonnell/Tymshare merger had failed, and knowing that this would depress the market value of the stock, owed a duty to its shareholders and the investing public to correct this information by announcing that merger with McDonnell was being discussed once again.

He asserts that the facts summarized above state a cause of action for breach of fiduciary duty under California common law, relying upon several cases discussing in general the duties of fiduciaries towards their beneficiaries. There are no California cases addressing the specific issue presented here. The duty of corporate directors regarding disclosure of merger negotiations has been firmly established, however, in a body of federal law interpreting the national Securities Exchange Act (Act).

The pertinent sections of the Act are rule 10b-5 (17 C.F.R. § 240.10b-5 (1983)) and section 14(e) (15 U.S.C. § 78n(e)) which generally provide that it is unlawful to fail to disclose any "material fact" "in connection with" the purchase or sale of any security. The federal cases interpreting these sections are clear that the duty of disclosure does not extend to disclosure of merger negotiations before an agreement in principle is reached. (*Staffin* v. *Greenberg* (3d Cir. 1982) 672 F.2d 1196; *Greenfield* v. *Heublein, Inc.* (3d Cir. 1984) 742 F.2d 751.)

In the case of *Staffin* v. *Greenberg, supra,* 672 F.2d 1196, shareholders of Bluebird, Inc. sold stock to their company at $10 per share in response to a tender offer, only to see Bluebird merge with another company, at $15 per share, the following month. The takeover company, Northern Foods, had been interested in purchasing Bluebird previously, but had decided against acquisition when Bluebird's controlling shareholder and chief executive officer left the company. The tender offer statement, while it disclosed that the chief executive officer had returned to Bluebird, did not disclose that Northern Foods had also re-emerged as a possible purchaser, even though preliminary merger negotiations were developing during the course of the tender offer.

The federal court affirmed summary judgment for defendant Bluebird, holding that it is not necessary to disclose merger negotiations in connection with a purchase or sale of securities. (*Staffin* v. *Greenberg, supra,* 672 F.2d at p. 1205.) [¶] "The reason that preliminary merger discussions are *immaterial as a matter of law* is that disclosure of them may itself be misleading. [Citation.] A substantial body of opinion suggests that disclosure of preliminary merger discussions would, by and large, do more harm than good to shareholders and the values embodied in the anti-fraud provisions of the Act. . . . [¶] Those persons who would buy stock on the basis of the occurrence of preliminary merger discussions preceding a merger which never occurs, are left 'holding the bag' on a stock whose value was inflated purely by an inchoate hope. If the announcement is withheld until an agreement in principle on a merger is reached, the greatest good for the greatest number results. If the merger occurs, all of the company's shareholders usually benefit; if no merger agreement is reached, the stock performs as it would have in any event." (*Id.,* at pp. 1206-1207, italics added.)

Two years after the decision in *Staffin* v. *Greenberg,* the same court decided the case of *Greenfield* v. *Heublein, Inc., supra,* 742 F.2d 751, on facts particularly close to ours. The *Heublein* case involved both hostile and friendly merger attempts. General Cinema was attempting to take over Heublein Inc. through large-scale open market purchases of its stock, a development which was strongly opposed by Heublein's directors. Negotiations were ongoing but no agreements had been reached. When trading in Heublein stock suddenly increased, presumably in anticipation of a possible merger, the New York Stock Exchange asked Heublein for a "no corporate development" statement. On July 14, Heublein issued such a statement which said that the company "was aware of no reason that would explain the activity in its stock in trading on the NYSE today." When General Cinema tendered a "nonnegotiable" demand to Heublein on July 23, Heublein called upon its "white knight," Reynolds Company, with whom it had also been negotiating. Heublein and Reynolds met to discuss a merger on July 26, but no agreement was reached. The next day the two agreed upon a price of $60 per share and on July 28 trading was suspended to announce this development. (*Id.,* at pp. 753-754.)

Plaintiff Greenfield was a stockholder in Heublein. He was generally aware of the takeover attempt by General Cinema, and watched the increased activity and rise in price of Heublein stock. On the basis of the "no corporate development" statement, which had the effect of stabilizing prices, he determined to sell and did so at $45.25 per share on July 27, the precise day upon which Reynolds agreed to buy at $60 per share. Greenfield sued claiming that in issuing the "no corporate development" statement and failing to update it to announce the subsequent heating up of merger ne-

gotiations, Heublein had illegally withheld material information. (*Id.*, at pp. 754-755.)

Summary judgment for defendant Heublein was affirmed. The court applied a two-step analysis: "(1) when does a duty to disclose arise in the context of merger/anti-takeover discussions [citation]; and (2) when a voluntary public statement is made, under what circumstances will it be materially misleading when issued or become so on the basis of subsequent events [citations]." (*Id.*, at pp. 755-756.) The court concluded that no duty to disclose arises until the companies have reached agreement on fundamental terms, namely price and structure. Disclosure prior to this point would be based on facts subject to change at any time, and would result in successive, possibly cancelling, announcements as negotiations progressed. This would tend to confuse and mislead, rather than enlighten, the investing public. In addition to having a disruptive effect on the market, premature disclosures of negotiations in the preliminary stages might well disturb the delicate balance of negotiations and inhibit acquisition ventures. (*Id.*, at p. 757.)

Other cases have framed the issue in terms of the materiality of the disclosure, finding that preliminary merger negotiations are simply not material as a matter of law. "[I]f the standard of materiality is unnecessarily low, not only may the corporation and its management be subjected to liability for insignificant omissions or misstatements, but also management's fear of exposing itself to substantial liability may cause it simply to bury the shareholders in an avalanche of trivial information—a result that is hardly conducive to informed decisionmaking." (*TSC Industries, Inc.* v. *Northway, Inc.* (1976) 426 U.S. 438, 448 [48 L.Ed.2d 757, 765-766, 96 S.Ct. 2126].)

In the *Heublein* case, neither the General Cinema nor the Reynolds discussions had resulted in agreement regarding price and structure until July 27. Since Greenfield placed his order to sell before that date, he could not complain of a failure to disclose. This was so even though the "no corporate development" statement had been issued. The court found that this statement was not false, inaccurate or misleading at the time it was issued. Furthermore, "as a matter of law, it never became materially misleading on the basis of subsequent events and, therefore, no duty to correct ever arose." (*Greenfield* v. *Heublein, Inc., supra,* 742 F.2d at pp. 759-760.)

This was exactly the situation in our case. Tymshare's announcement that McDonnell had withdrawn its merger offer and terminated negotiations was true when made. Thereafter there was no duty to make another disclosure until a new agreement in principle was reached.

Eldridge concedes that corporations have a right to maintain complete silence regarding merger negotiations until tentative agreement is reached. He claims nonetheless that Tymshare's silence regarding resumed negotiations with McDonnell must be judged in light of the two affirmative announcements previously made public, namely that an agreement had been reached at $31 per share and then that the deal was off. He claims this distinguishes his case from those where no information is released. We do not agree. In the first place plaintiffs in *Heublein* and *Staffin* did not sell in an informational vacuum. In both cases they were relying on announcements previously released in making their decisions to sell. Furthermore, we are not persuaded that resumed preliminary negotiations are materially different from initial preliminary negotiations; the reasons behind the rule of nondisclosure are the same in either case.

The recent case of *Starkman* v. *Marathon Oil Co.* (6th Cir. 1985) 772 F.2d 231 supports our conclusion. In that case plaintiff sold his stock in Marathon Oil for $78 per share the day before U.S. Steel's tender offer of $125 per share was announced. Plaintiff claimed that Marathon should have informed the public about the negotiations with its "white knight," U.S. Steel, especially in light of a press release and a letter to shareholders indicating that an offer from Mobil Oil would be rejected and that Marathon was determined to remain independent. The letter also described a number of alternative courses, including "a business combination with another company." Attached to this letter was a copy of Marathon's Schedule 14 D-9 filing with the Securities and Exchange Commission which reflected the board's belief that "'this is an extremely inopportune time to sell the Company and, in any event, . . . its shareholders would be better served if the Company were to remain independent.'" Plaintiff argued that this information created a false impression that Marathon was not considering a sale, when in fact negotiations with U.S. Steel had begun at the time. Summary judgment for Marathon was granted and affirmed on the ground that the directors had no duty to disclose negotiations with U.S. Steel, because nondisclosure did not render the previous statements materially misleading. (*Id.*, at pp. 238, 243.)

The federal doctrine was developed under a statute with wording identical to that of the California statute on the same subject.[2] We find this to be

[2]Section 14(e) of the Securities Exchange Act (15 U.S.C. § 78n(e)): "It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, . . . in connection with any tender offer . . . or any solicitation of security holders . . . ."

Rule 10b-5, 17 Code of Federal Regulations section 240.10b-5 (1983): "It shall be unlawful for any person . . . [¶] (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circum-

reflective of the view in this state that federal law and procedure be followed in this field. Accordingly, we conclude that as a matter of law corporate directors are under no duty to make a public disclosure of merger negotiations until an agreement in principle has been reached. Therefore the demurrer to this cause of action was properly sustained.

Since there is no duty to disclose the occurrence of preliminary negotiations, there is a fortiori no duty to disclose the substance of such negotiations. Therefore the demurrer was also proper as to Eldridge's allegation that the directors failed to make disclosure of certain offers tendered by McDonnell and rejected by Tymshare before agreement was announced.

## 2. *Rejection of Tender Offers Out of Negligence and Improper Motive.*

Eldridge's allegations in this regard are that the directors wrongfully rejected offers made by McDonnell in the course of merger negotiations at prices higher than the eventual purchase price of $25 per share. He claims that in so doing the directors negligently relied on financial projections that they either knew or should have known were grossly inaccurate, and further that they were motivated by a desire to preserve their positions of control in the corporation.

■ Tymshare raises the bar of the so-called "business judgment rule." The business judgment rule is premised on the notion that "those to whom the management of the corporation has been entrusted are primarily responsible for judging whether a particular act or transaction is one which is helpful to the conduct of corporate affairs or expedient for the attainment of corporate purposes . . . ." (*Marsili* v. *Pacific Gas & Elec. Co.* (1975) 51 Cal.App.3d 313, 324 [124 Cal.Rptr. 313].) It sets up a presumption that directors' decisions are based on sound business judgment. This presumption can be rebutted only by a factual showing of fraud, bad faith or gross overreaching. (*Beehan* v. *Lido Isle Community Assn.* (1977) 70 Cal.App.3d 858, 865 [137 Cal.Rptr. 528].)

■ In the context of merger negotiations, "[a] 'target' corporation's decision to accept or resist a takeover bid . . . necessarily rests with the board of directors, since it is the directors, and not the shareholders, who

---

stances under which they were made, not misleading . . . [¶] (c) . . . in connection with the purchase or sale of any security."

California Corporations Code section 25401: "It is unlawful for any person to offer or sell a security in this state or buy or offer to buy a security in this state by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

are best able to evaluate the numerous and often complex financial factors which must be considered in determining whether the takeover proposal serves the best interests of the corporation." (*Enterra Corp.* v. *SGS Associates* (E.D.Pa. 1985) 600 F.Supp. 678, 686.) A plaintiff challenging a decision made in this context must be able to make specific allegations of malfeasance or bad faith. Where an improper motive is claimed, plaintiff must allege that it was the sole or primary reason for the directors' actions. (*Johnson* v. *Trueblood* (3d Cir. 1980) 629 F.2d 287, 292-293; *Starbird* v. *Lane* (1962) 203 Cal.App.2d 247 [21 Cal.Rptr. 280].)

Tymshare's demurrer attacked the pleading on two bases: 1) that certain allegations were inconsistent and contradictory; and 2) that the facts were not pleaded with specificity.

█ The demurrer was brought in conjunction with a motion to strike that portion of the first amended complaint which alleged that the directors had rejected higher offers "primarily in order to maintain themselves in their director positions," on the ground that this allegation was patently inconsistent with the directors' acceptance of offers at $31 per share and later at $25 per share. █ We agree that without the allegation of improper motive Eldridge's cause of action could not overcome the bar of the business judgment rule and the sustaining of the demurrer would have been proper. The trial court, however, did not strike this allegation. █ Indeed whether the directors' actions were consistent or not is a factual argument and not properly raised at the pleading stage.

Secondly, Tymshare claimed that Eldridge's pleading lacked factual specificity. █ While it is true as a general rule that fraud should be pleaded with particularity (*Cooper* v. *Leslie Salt Co.* (1969) 70 Cal.2d 627, 636 [75 Cal.Rptr. 766, 451 P.2d 406]), we note that this is not always possible in those cases where the specific facts are within the knowledge and control of the defendant, and especially where defendant is a fiduciary. (*Committee on Children's Television, Inc.* v. *General Foods Corp.* (1983) 35 Cal.3d 197, 217 [197 Cal.Rptr. 783, 673 P.2d 660].)

█ If Eldridge's first amended complaint exhibits a genuine frailty in this regard, it lies in the allegations establishing the element of damages. Eldridge has alleged that he and the class he represents owned stock in Tymshare on or before the alleged offers to purchase were tendered by McDonnell, i.e., between December 20, 1983, the day after termination of negotiations was announced and February 26, 1984, the day before the tentative agreement was announced; that between these dates he and others sold stock at prices less than those offered by McDonnell and wrongfully rejected by the directors; and that as a result of the directors' breach of

fiduciary duty, the shareholders were damaged in the approximate amount of $12.2 million. In our view these allegations do not suffice to state a claim for damages. It stands to reason that if a shareholder sold stock during this time but before the rejection of higher offers by the directors, he would not have been damaged. Thus Eldridge can only claim that he suffered a loss if he alleges that the Tymshare directors wrongfully rejected the bona fide offers while he and others still owned their shares. If Eldridge can amend his complaint to so allege, he should be allowed to do so.

The trial court sustained the demurrer as to the entire first amended complaint without identifying any particular deficiency in this second cause of action. This cause of action was unchanged in the first amended complaint since the first demurrer had concentrated solely on the failings of Eldridge's nondisclosure cause of action. Therefore, the court's order sustaining the demurrer without leave to amend, which simply stated that "Plaintiff has failed to plead a cause of action for defendants' breach of fiduciary duties" had the effect of dismissing this portion of Eldridge's complaint without allowing the opportunity for amendment. ·

An order sustaining a demurrer without leave to amend is unwarranted and accordingly constitutes an abuse of discretion if there is a reasonable possibility that the defect can be cured by amendment. (*Temescal Water Co.* v. *Dept. Public Works* (1955) 44 Cal.2d 90, 107 [280 P.2d 1].) This is so even though, as here, no request for leave to amend was made in the trial court. Code of Civil Procedure section 472c provides: "When any court makes an order sustaining a demurrer without leave to amend the question as to whether or not such court abused its discretion in making such an order is open on appeal even though no request to amend such pleading was made . . . ."

At oral argument before this court Tymshare made the point that Eldridge had not appealed on the basis that the trial court had abused its discretion by denying him leave to amend, but had elected instead to stand on the strength of his pleadings as they were. Citing the case of *Goodman* v. *Kennedy* (1976) 18 Cal.3d 335 [134 Cal.Rptr. 375, 556 P.2d 737], Tymshare argued that before Eldridge be given the opportunity to amend, he "must show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading." (*Id.,* at p. 349.) Since the issue of amendment had not been addressed on appeal, we asked for supplemental briefing from the parties.

Initially we note that *Goodman* is not entirely apposite here since in that case plaintiff had been made aware of certain defects in his pleading at the trial level and had attempted to amend three times in response to orders

sustaining demurrers. At oral argument and in his briefs on appeal plaintiff was unable to demonstrate that he could amend his complaint to plead all the elements of his cause of action. Judgment of dismissal was therefore properly affirmed.

In contrast, as we note above, Eldridge did not have the opportunity to amend his second cause of action to correct the defect we identify here. Although we invited letter briefing on the issue of amendment, neither party responded to our comments regarding the insufficiency of the damages claim. Recognizing that Eldridge did not have the benefit of a transcript of the proceedings at oral argument in this court nor the guidance of our written opinion, we find that this failure to propose the specific amendments we now require is excusable.

We therefore reverse the judgment for the limited purpose of permitting Eldridge to correct any uncertainty or lack of required specificity in his cause of action alleging wrongful rejection of tender offers. As to the cause of action alleging failure to disclose merger negotiations the judgment of dismissal is affirmed. Each party is to bear his own costs on appeal.

Agliano, P. J., and Simmons, J.,* concurred.

Appellant's petition for review by the Supreme Court was denied January 21, 1987.

---

*Assigned by the Chairperson of the Judicial Council.