George H. KEYSER, Individually, as class representative on behalf of others similarly situated, and derivatively on behalf of Commonwealth National Financial Corporation, and Walter W. Shearer, Plaintiffs,

v.

COMMONWEALTH NATIONAL FINANCIAL CORPORATION, et al., Defendants.

Civ. No. 85–1853.

United States District Court,
M.D. Pennsylvania,
Third Circuit Division.

April 7, 1986.

David Aufhauser, Williams & Connolly, Washington, D.C., John Havas, Harrisburg, Pa., for plaintiffs.

Walter T. McGough, Anthony J. Basinski, Pittsburgh, Pa., Robert B. Hoffman, Harrisburg, Pa., for Mellon Bank Corp.

Jon A. Baughman, Joyce K. Hackenbrach, Seth D. Linfield, Pepper, Hamilton & Scheetz, Philadelphia, Pa., Lewis S. Kunkel, Jr., Pepper, Hamilton & Scheetz, Harrisburg, Pa., for Commonwealth National Financial Corp, Individual Director defendants.

NEALON, Chief Judge.

## MEMORANDUM AND ORDER

### I.  PROCEDURAL HISTORY

Plaintiff, George H. Keyser, brought this action pursuant to 28 U.S.C. §§ 1331, 1332

alleging violations of section 27 of the Securities Exchange Act of 1934 [1934 Act], 15 U.S.C. § 78aa and state law. Specifically, plaintiff alleges that defendants violated Sections 10(b) and 14(a) of the 1934 Act 15 U.S.C. §§ 78j(b), 78n(a) and the regulations and rules promulgated under those sections, *see* Rules 10b–5 and 14a–9(a), 17 C.F.R. §§ 240.10b–5, 240.14a–9(a), when defendants mailed false and misleading proxy materials soliciting shareholder approval of a proposed merger. Additionally, plaintiff alleges that the defendants violated their fiduciary duty owed to shareholders when they approved the Investment and Warrant Agreement granting Mellon a lock-up option.

Plaintiff sought a preliminary injunction on December 19, 1985, seeking to stop the shareholder meeting scheduled for December 30, 1985. By agreement of the parties, the shareholder meeting took place and the preliminary injunction was formally denied January 9, 1986. *See* Document 14 of the Record. By Order dated March 14, 1986, this court granted leave to add an additional party plaintiff, Walter W. Shearer. All supporting and opposing briefs to the Motion of plaintiffs for Summary Judgment and Injunction and documents were filed under seal. The motion is now ripe for disposition.* For the reasons set forth below, plaintiffs' Motion for Summary Judgment will be denied.

## II. FACTUAL BACKGROUND

A detailed account of the factual background of the action is necessary for resolution of plaintiffs' motion. The record demonstrates that the parties substantially agree upon the relevant facts. The Statement of Material Facts submitted by both parties indicate that the material facts necessary to dispose of the motion are not in dispute. *See* Documents 23 and 37 of the Record.

As a preliminary matter, the court notes that all reasonable inferences must be favorably attributed to defendant. This court may not resolve factual disputes on a motion for summary judgment; rather, based upon those genuine issues of material fact not in dispute, the court must determine whether plaintiffs have demonstrated that they are entitled to judgment as a matter of law.

### A. The Parties and Participants

Commonwealth National Financial Corporation [Commonwealth] a one-bank holding company, is a Pennsylvania corporation headquartered in Harrisburg, Pennsylvania. Its only subsidiary is Commonwealth National Bank [CNB]. Commonwealth reported total consolidated assets of $1,409,-854,000.00 as of September 30, 1985. Charles F. Merrill [Merrill] is President and Chief Executive Officer of both Commonwealth and CNB. Additionally, Merrill serves as director on the Boards of both corporations. The shares of Commonwealth are publicly traded on the National Market System of NASDAQ.

Meridian Bancorp, Inc., [Meridian] a multi-bank holding company, is a Pennsylvania corporation, headquartered in Reading, Pennsylvania. Meridian's total consolidated assets as of December 31, 1984 were $5,494,282,000.00. Samuel A. McCullough [McCullough] is President and Chief Executive Officer of Meridian. Meridian's shares are also traded on the National Market System.

Mellon Bank Corporation [Mellon], another multi-bank holding company, is also a Pennsylvania corporation whose shares are traded publicly on the New York Stock Exchange. On September 30, 1985, Mellon reported total consolidated assets of $31,-868,045,000.00. David L. Martin [Martin] is a Senior Vice President in charge of Corporation Development at Mellon.

The final participants are investment banking firms. Goldman, Sachs & Company [Goldman Sachs] was retained by Com-

---

* Plaintiffs have also filed a petition for class certification dated March 19, 1986. This peti-

tion is not yet ripe for disposition.

monwealth to act as a financial advisor and to provide *inter alia* "anti-raid advisory advice." Keefe, Bruyette & Woods, Inc. [Keefe Bruyette] rendered financial advice to Meridian, although it is unclear whether this was on a formal basis or on an informal basis with McCullough. Finally, Merrill, Lynch, Pierce, Fenner & Smith, Inc., [Merrill Lynch] was retained by Mellon to help analyze the financial possibilities of Mellon acquiring Commonwealth.

## B. Pre-Merger Events

The following facts are either admitted or unchallenged. While there are some areas of disagreement, those facts disputed are not material for the purposes of the summary judgment motion presently before the court.

The parties dispute just how long Meridian has wanted to acquire Commonwealth and for what period of time Mellon has been interested in merging with Commonwealth. It is unquestioned, however, that in late 1982, McCullough, acting as President of Meridian's predecessor bank-holding company American Bancorp, Inc., met with John R. Biechler, then Chief Executive Officer of Commonwealth, to discuss the possibility of a merger of the two companies. Biechler, apparently generally interested, sent McCullough a report entitled "An Analysis of Commonwealth National's Future Alternatives" [Danielson Report] prepared by Danielson Associates for Commonwealth. This report concluded that a merger with Meridian's predecessor was "almost a planner's dream" but that Mellon was also an excellent bank which should not be ruled out completely. Statement of Material Facts Not in Dispute, Document 23 of the Record at 8, ¶ 18 [Plaintiffs' Facts]; Defendants' Joint Statement in Re-

sponse to Plaintiffs' Statement of Material Facts Not in Dispute and Supporting Exhibits, Document 37 of the Record at 3–4, ¶ 18 [Defendants' Facts]. McCullough and Biechler spoke on and off during 1983 up until the summer of 1983. It was during the summer of 1983 that McCullough and Meridian realized that discussions of merger possibilities would have to be held in abeyance after Biechler informed McCullough that Commonwealth was trying to determine a value for the bank.[1] It was not until September, 1984, that McCullough resumed his quest for Commonwealth. By this time, Merrill held the reins of control of Commonwealth and was informed by McCullough that Meridian was ready "to talk at any time."[2] Plaintiffs' Facts at ¶ 24; Defendants' Facts at ¶ 24. Meridian then began to accumulate Commonwealth stock. McCullough informed Merrill of the purchases, stating he (and Meridian) intended to purchase more, but not an amount exceeding 4.9%. After being advised of Meridian's continued interest in merger, Merrill replied that he would contact McCullough if and when the interest was mutual.

On January 30, 1985, McCullough addressed and delivered a letter to Merrill; while McCullough characterizes this letter as an offer, Merrill disputes such a characterization. The purposes of the letter were "to congratulate [Merrill] on Commonwealth National's fine results for 1984 and, also, to continue discussions relating to a possible merger." Letter dated January 30, 1985 from McCullough to Merrill, Document 25 of the Record, Appendix 23 at 1. The contents[3] of this letter were the subject of an Executive Committee meeting of Commonwealth's directors on February 28, 1985. It was decided that CNB should

---

1. According to McCullough's understanding, Biechler was interested in at least discussing merger possibility while Merrill was more inclined to have Commonwealth remain independent. McCullough believed that Biechler wanted to wait a "number of quarters" to get Commonwealth's earnings "back in shape." Deposition of Samuel McCullough, Document 34 of the Record, Exhibit 8 at 181b.

2. A meeting was held between McCullough and Merrill on September 21, 1984, at which Merrill stated it was Commonwealth's intent to remain independent absent an "offer that could not be refused," *i.e.*, a price equal to 1.8 times book value. Plaintiffs' and Defendants' Facts at ¶ 23.

3. The letter is phrased only in general terms and no specific price per share was discussed.

retain investment banking expertise and on March 20, 1985, the Board of Directors of both Commonwealth and CNB voted to engage Goldman Sachs to evaluate the CNB situation. Goldman Sachs advised Commonwealth that it would be premature for Commonwealth to sell in the Spring of 1985 but that four prospective acquirers existed, or would exist: Mellon, Fidelcor, Pittsburgh National Corporation and Meridian. The Commonwealth Board discussed Goldman Sach's evaluation at great length on April 17, 1985 and resolved to remain independent because, *inter alia*, it had not fully realized its earnings potential which would make it more valuable as a potential merger partner. The Board resolved to inform McCullough of Commonwealth's decision. It also was concluded that McCullough should be advised that if Commonwealth were pressed, it would open up bidding to all other interested bank holding companies. Upon being so advised by telephone, McCullough expressed concern over rumors that Commonwealth was discussing merger with Mellon. Merrill responded that this was not true and that he would keep in touch. Plaintiffs' Facts at ¶ 34.

During the Summer, 1985, Commonwealth and Goldman Sachs worked upon a plan to raise equity capital for Commonwealth. It is conceded that Commonwealth was in need of additional capital, *see* Deposition of David Budd, Document 34 of the Record, Exhibit 3 at 45b, although plaintiffs speculate that this was a particularly large offering which might place Commonwealth out of the reach of many potential acquirer-banks, such as Meridian, which was only a medium-sized bank. *Id.* These discussions culminated in a preliminary prospectus being filed with the Securities and Exchange Commission [SEC] on September 10, 1985, covering the sale of 718,-750 shares of common stock. By this time,

Meridian and its financial advisor, Keefe Bruyette, notwithstanding Commonwealth's prior notice of its desire to remain independent, had decided to attempt again to engage Commonwealth in negotiations.[4]

## C. The September 12, 1985 Letter

On September 12, 1985,[5] a letter was sent by Meridian to the Commonwealth Board of Directors and Goldman Sachs. It is hotly disputed by the parties whether this letter constituted an "offer" or if it was merely an "invitation to bid." [6] Plaintiffs' and Defendants' Facts at ¶ 42. According to plaintiffs' version, the letter constituted an offer by Meridian to purchase 100% of Commonwealth's common stock by exchanging it for Meridian common stock with an approximate value of $38.00 per share. This price, according to plaintiffs, represented a 45% premium over the $26.25 market bid for Commonwealth shares prior to the September 10th announcement of the 718,750 public shares offering and the $38.00 per share offering price was 1.6 times book value. Defendants, on the other hand, characterize the September 12th letter as an "invitation to bid" in which merger possibilities were again discussed and a price and other conditions, far from definite or firm, were proposed. *See infra* at n. 21. All "proposals" in the letter, according to Commonwealth, were subject to further negotiation inasmuch as Meridian indicated willingness to negotiate further. The letter contained a number of categories of discussion: Proposed Financial Terms; Board Composition; Management; Effect on Community; Anti-Competitive Effects; and Conditions. Under Conditions, the letter provided that "[c]onsummation of the transaction will require the execution of a definitive agreement containing the usual representations, warran-

---

4. Presumably, Meridian was concerned that Commonwealth's proposed stock offering would have an adverse effect on Meridian's merger plans.

5. The letter dated September 12, 1985 is set out in its entirety in Appendix A attached to this Order.

6. This controversy does not constitute a dispute as to a material fact, but rather, as to a legal conclusion.

ties, access [*i.e.*, due diligence] and other customary provisions, approval thereof by each of our respective Boards, the required affirmative vote of Commonwealth's and Meridian's shareholders, and required regulatory approvals." Appendix A at 4. The preceding terms, such as "other customary provisions," would appear to be prone to different interpretations but the record does not elucidate whether they are objectively determinable in bank merger transactions. As an additional condition, the Meridian letter noted that if Commonwealth completed its public offering, then "it will be necessary for Meridian to revise the terms of this offer downward to reflect the effects of such offering." *Id.*

Regardless of how the letter is classified, the next day, Commonwealth discussed the letter's contents, among other things, with Goldman Sachs. Goldman Sachs, through Keefe Bruyette, requested that Meridian withdraw its "offer" because Commonwealth was still trying to remain independent.[7] On September 16, 1985, a notice was issued to Commonwealth's Executive Committee for a special meeting "to discuss an unsolicited merger offer" received from Meridian. Plaintiffs' and Defendants' Facts at ¶ 47.

After a four-to-five hour meeting of the Commonwealth Executive Committee, the Committee resolved against entering into negotiations with Meridian based on the terms and conditions set forth in the September 12th letter; it was further resolved that Commonwealth senior management had authority to initiate discussions with Meridian and other potential merger part-

ners for consideration by the Board. Document 26 of the Record, Appendix 43 at 3. A full Board meeting was held on September 18, 1985, at which the full Board adopted and passed the Executive Committee's resolutions.[8]

McCullough expressed his disappointment upon being advised by Merrill of the Board's decisions that day. Merrill Deposition, Document 34 of the Record, Exhibit 9 at 221b. Nevertheless, the next day, September 19th, McCullough telephoned back to inform Merrill that Meridian intended to make public the September 12th "offer." That day, Meridian issued a press release indicating the terms of the letter, Commonwealth's rejection and that the "offer remained open." Plaintiffs' Facts at ¶ 55; *see* Press Release dated September 19, 1985, Document 35 of the Record at Exhibit 28. Commonwealth responded by issuing a press release of its own. *See* Document 26 of the Record, Exhibit 49.

### D. The September 25, 1985 Letter

On September 25, 1985, a second letter was sent to Commonwealth. In the letter, Meridian reaffirmed the terms of the September 12th letter and further stated: "[w]e are prepared to negotiate any aspect of Meridian's offer which led your Board to conclude that it is not in the 'best interest of the shareholders of Commonwealth, employees and the communities served by the bank.'" Plaintiffs' Facts at ¶ 58 (citing Document 26 of the Record, Appendix 50). As an explanation of intent, "Meridian and Keefe Bruyette intended that sentence to

---

**7.** Additionally, Merrill expressed some concern as to how a public disclosure by Meridian would affect Commonwealth's public offering. Deposition of Charles F. Merrill, Document 34 of the Record, Exhibit 9 at 222b–223b.

**8.** The resolutions read as follows:
RESOLVED, That this Board of Directors deems it not to be in the best interests of the Corporation and its shareholders to enter into negotiations leading toward a possible merger with Meridian Bancorp, Inc. on the terms and conditions set forth in a certain letter from Samuel M. McCullough to this Board, dated September 12, 1985; and

FURTHER RESOLVED, That in the event the circumstances so require in the judgment of Senior Management, Senior Management is hereby authorized to initiate discussions with Meridian Bancorp, Inc. and other responsible potential merger partners with a view toward structuring one or more offers, on terms no less advantageous to the Corporation and its shareholders than those advanced by Meridian Bancorp, Inc., for consideration by this Board of Directors.
Document 26 of the Record, Exhibit 45 at 5.

mean that all terms, including price, were open to negotiation." Plaintiffs' Facts at ¶ 59.

### E. Mellon Bank Enters

While Mellon and Commonwealth had discussed generally merger possibilities as early as 1983, Mellon became active in this scenario after Meridian's public announcement.[9] After hearing of Meridian's "offer," Martin telephoned Merrill on September 12, 1985, to let him know that Mellon "could be helpful in case something happened." Facts at ¶ 62. When the two spoke again on September 19th, Merrill advised Martin that Commonwealth did not view Meridian's "proposal" as a friendly overture and that the Board was adamant about remaining independent. Martin stated that Mellon would be interested in a "stake-out"[10] in an attempt to help Merrill. Mellon, by offering its help to Commonwealth, at this point can be considered a potential "white knight."[11] The possibility of a stake-out was discussed by Merrill and

Martin at greater lengths until September 27, 1985 when the feasibility of immediate merger was broached by Merrill. Plaintiff's Facts and Defendants' Facts at ¶ 68. While the litigants sharply dispute the depth and detail of the potential merger discussion, it is clear at least the subject was mentioned. It is unclear whether Meridian was aware of Mellon's entry into the picture at this point. Meanwhile, Meridian and Keefe Bruyette continued their quest of acquisition culminating in another letter addressed to the Commonwealth Board.

### F. September 30, 1985 Letter

By letter dated September 30, 1985, sent to the Commonwealth Board from Meridian, Meridian amended the terms of the September 12th letter in an attempt to make the deal appear more attractive. Again, the parties sharply dispute whether the letter constituted an "offer" or another "invitation to negotiate."[12] The terms of the letter,[13] regardless of its character-

9. Merrill also told Martin of Commonwealth's desire to remain independent throughout their conversations. Deposition of David L. Martin, Document 34 of the Record, Exhibit 6 at 140b.

10. A "stake-out" is a minority investment in a corporation in which the helping corporation buys a block of stock thereby providing the target corporation with enough capital to avoid acquisition.

11. In financial nomenclature, a white knight is a third company that the target (Commonwealth) persuades to merge with it or make a competing offer in the hopes that it will lead to an end result more to the target's liking. Loss, Fundamentals of Securities Regulation at 570.

12. Indeed, plaintiffs contend that Goldman Sachs characterized the letter as a "bear hug" letter which would require the Commonwealth Board to meet. A "bear hug" is "an ultimatum out of the blue with or without public announcement, in which a formal acquisition or merger proposal is made to target management with the hope of avoiding the necessity for a tender offer." Loss, supra note 11 at 569–70. Plaintiffs also argue certain Commonwealth directors were demanding a Board meeting. Defendants contend that while a meeting may have been requested, it was not because of Meridian's letter but rather because some members were going on vacation and preferred to have a meet-

ing before their departure. Defendants' Facts at ¶ 76.

13. The letter was written as follows:
September 30, 1985
Board of Directors
Commonwealth National Financial
Corporation
10 South Market Square
Harrisburg, PA 17108
Gentlemen:
Please refer to the offer by Meridian Bancorp, Inc. ("Meridian") to affiliate with Commonwealth National Financial Corporation ("Commonwealth"), dated September 12, 1985 and to Meridian's correspondence with Commonwealth dated September 25, 1985. By this letter, Meridian:
—proposes to amend its September 12, 1985 offer so that each of Commonwealth's approximately 2,980.000 outstanding shares and any shares issuable under existing options and warrants (as disclosed Commonwealth's recent registration statement on Form S–2, filed with the Securities and Exchange Commission), be exchanged in connection with the transaction, for newly issued shares of Meridian giving Commonwealth shareholders a market value of approximately $39, rather than the $38 value set forth in Meridian's September 12, 1985 offer.
—desires to reiterate that it is prepared to negotiate any aspect of Meridian's offer which

ization, discussed a purchase price of $39.00 per share and stated that Meridian was willing to negotiate any aspect of the "offer." It further added: "Please be advised that if you do not inform us, before the close of business on Friday, October 4, 1985 of your intent to negotiate with us, we intend to withdraw our September 12th offer (as amended by this letter)." Facts at ¶ 73 (citing Document 27 of the Record, Appendix 60). Commonwealth did not respond to this letter.

The next day, October 1, 1985, Commonwealth issued a press release indicating Meridian had increased its unsolicited bid to $39.00 per share and that Merrill did not believe any significant changes had occurred warranting a change in Commonwealth's intent to remain independent. *See* Document 27 of the Record, Appendix 64. Meanwhile, Mellon with its financial advisor, Merrill Lynch, was still working on a plan for a stake-out between Mellon and Commonwealth. Late in the afternoon of October 1, 1985, Martin and Merrill Lynch met with Goldman Sachs regarding the details of a stake-out. At some point, Goldman Sachs, after private conference, asked if Mellon would consider an upfront merger instead of the stake-out. In response, Martin replied that he had been respecting Commonwealth's desire to remain independent but if given the opportunity Mellon would be more flexible in the structure of consideration than Meridian and would "go north" of $39.00 to be competitive.

### G. The Merger Weekend

Martin called Merrill on Friday, October 4, 1985, (which was the deadline date set by Meridian) to formally express Mellon's in-

terest in a merger with Commonwealth and to state that Martin believed after a due diligence review that Mellon would be able to go forward with a $40–$42 per share merger. Later that afternoon, Merrill Lynch delivered a proposal term sheet to Goldman Sachs covering the proposed merger.

The proposal included, *inter alia*, the $40–$42 per share bid as well as a Stock Purchase Warrant allowing Mellon to purchase up to 24.9% of Commonwealth's common stock at $34.75 per share.[14] Additionally, the proposal provided that a definitive merger agreement was to be completed no later than Sunday evening, October 6, 1985. While merger discussions and negotiations continued through the weekend, an agreed-upon price had still not been reached by Monday. This, apparently, was a result of the weekend due diligence review by Mellon which had not revealed Commonwealth in as fiscally healthy position as had been anticipated. As a result, Mellon did a supplemental due diligence on Monday in order to justify a $40 per share offer. *See e.g.,* Deposition of Richard Allen Sapp, Document 34 of the Record, Exhibit 11 at 294b. It was obvious, at this time, that Commonwealth's management was cooperating more with Mellon than it was with Meridian by allowing, *e.g.,* a due diligence review.

On Monday, October 7, 1985, Meridian issued a press release that "it [had] terminated and withdrawn its offer for Commonwealth National Financial Corporation." This was confirmed in a telephone conversation between counsel for Meridian and Commonwealth as well as by letter addressed to the Commonwealth Board. Af-

---

led Commonwealth's Board to conclude that Meridian's offer is not "in the best interests of the shareholders of Commonwealth, employees and the communities served by the Bank." Please be advised that if you do not inform us, before the close of business on Friday, October 4, 1985 of your intent to negotiate with us, we intend to withdraw our September 12 offer (as amended by this letter).

> Very truly yours,
> MERIDIAN BANCORP, INC.
> By ——————————
> Samuel McCullough

President and Chief
Executive Officer
SAM/nc
Document 27 of the Record, Exhibit 60.

**14.** The $34.75 price per share represents the market price of Commonwealth Stock on October 7, 1985, the day before the transaction was approved. *See infra* note 32. A Stock Purchase Warrant effectively precludes other competitors from blocking the merger.

ter consultation with Goldman Sachs representatives and Shuff and Merrill of Commonwealth, F. John Hagele, Esq., counsel for Commonwealth, initiated the telephone call to Meridian's outside counsel, Joseph Harenza. He advised Harenza that Commonwealth was holding a Board meeting the following morning and that it "would be in everyone's best interests if the [Meridian] offer remained outstanding, and that no public announcement be made of its withdrawal." Harenza responded that he thought it was too late because Meridian had initiated a public release withdrawing the offer and expressed concern about confusing the investment public. He added that he did not know if Meridian would be willing to stop it. In a second telephone conversation, Hagele was told by Harenza that the news release withdrawing the offer had already hit the wires but that Meridian would countermand its press release only if Commonwealth would accept the September 30th offer or would set a place and time for negotiations. Defendants further contend that Meridian advised it "would have to consider whether to reinstate the offer" and would "only withdraw the [press] release if [Commonwealth] management immediately commits to [Meridian] to recommend its offer to the board." Defendants' Facts at ¶ 98 (citing Deposition of F. John Hagele, Esq., Document 37 of the Record, Exhibit 22 at 209a–215a).[15] Hagele did not agree, nor did anyone else from Commonwealth, to Meridian's demand. Hagele's deposition testimony is accepted because it has not been challenged by plaintiffs by submitting

a counter-affidavit of Harenza. The parties do agree that at no point during these conversations did Commonwealth inform Meridian of Mellon's offer. There is nothing in the record to show that the press release was ever rescinded nor was Meridian's "offer" formally reinstated. While the parties disagree as to whether Commonwealth bargained sufficiently for a high enough price, on Monday evening, October 7, 1985 Mellon offered a $40 per share price.

### H. Commonwealth's Board Meeting

At 8:00 A.M. on Tuesday, October 8, 1985, the Board of Directors for Commonwealth met. According to defendants, presentations were made by Merrill, Goldman Sachs representatives and legal counsel. Copies of various documents were given to Board members to assist them in their deliberations.[16] In addition to the presentations discussed above, Merrill advised the Board that Meridian's September 30th "offer" had been withdrawn, although plaintiffs contend that no one informed the Board of the conversations between Hagele and Harenza relative to the conditions of a possible reinstatement of the offer. Instead, the focus of the meeting was directed to the conditions and terms of the Mellon offer. Major elements of the Mellon proposal which were discussed included: price per share; form of consideration; the manner in which shareholders would elect cash or share option; tax consequences to shareholders; legal structure of merger; Merrill's or another director's nomination to the Mellon Board; and various non-fi-

---

**15.** Hagele's deposition also states he informed Meridian counsel that it would be better if Meridian's proposal was before the Commonwealth Board on the following morning, Tuesday, October 8, 1985. In response to Meridian's ultimatum that Commonwealth sit down and negotiate, Hagele advised that it was not possible inasmuch as doing so would require authority from the Commonwealth Board. Deposition of F. John Hagele, Esq., Document 37 of the Record, Exhibit 22 at 210a. *See also infra* at 1140–41. Specifically, he testified:

> Certainly we had no authority to accept the offer and certainly I believed it was in everyone's best interest if we had the Meridian proposal before the board on Tuesday morning. I think technically, of course, we could have sat down and negotiated with Meridian without board authority, but at that point we were not prepared to do so.

Hagele Deposition at 210a.

**16.** Available to the Board members for their review were, *inter alia,* copies of a Goldman Sachs financial analysis; a summary of Mellon's

nancial issues.[17] After presentations and discussions, the Board of Commonwealth directors voted to approve the Mellon proposal.[18] That same morning, the Executive Committee of the Board of Directors of Mellon also approved the merger. At a later date, November 25, 1985, proxy materials were mailed to Commonwealth shareholders. The proxy statement scheduled a special meeting on December 30, 1985 for the purpose of soliciting shareholder approval of the Mellon merger. The meeting took place with 70% of the eligible voting shareholders casting their votes. Of the 70% of the votes cast, 94% voted in favor of the merger. That date of merger has been set for Wednesday, April 2, 1986.

## III. Discussion

Plaintiffs seek to enjoin consummation of the Mellon-Commonwealth merger. In support of this attempt, plaintiffs advance several arguments: first, that Commonwealth's failure to disclose Meridian's offers in the proxy statement violates § 14(a) of the Securities and Exchange Act inasmuch as Meridian's offers were material facts which defendants had a duty to disclose; second, that defendants misrepresented the background of the Mellon merg-

er negotiations in the proxy statement thereby misleading shareholders; third, that defendants failed to disclose Commonwealth management's and the Board of Directors' conflict of interest in the Mellon merger; and fourth, that by executing the investment agreement and warrant, the Commonwealth directors breached their state law fiduciary duty to shareholders. On the basis of these arguments, plaintiffs argue that they are entitled to summary judgment as a matter of law and a permanent injunction halting consummation of the Commonwealth-Mellon merger scheduled for April 2, 1986. Each argument will be addressed *seriatim*.**

### A. Failure to Disclose Meridian Offers

Plaintiffs contend that the proxy material soliciting approval of the Commonwealth merger failed to disclose Meridian's offers and thus is a violation under Section 14(a)[19] and Rule 14a–9.[20] The proxy material contains the following statement:

After another Pennsylvania bank holding company, on September 19, 1985, made a public proposal to negotiate the purchase of all the outstanding shares of Commonwealth Common Stock, Mellon again ap-

---

proposed plan of merger and the Investment Agreement and Warrant.

**17.** Non-financial issues included Commonwealth's retention of its identity, Board members continued service on Commonwealth's Board, market responsibility, management's continuing its present responsibilities and Mellon's providing new products introduced to support Commonwealth. Defendants' Brief at 39.

**18.** Plaintiffs contend the vote occurred at 9:48 A.M. whereupon the meeting was recessed. Plaintiff's Facts at ¶ 109. Defendants dispute this stating that the final board minutes reflect that the meeting was adjourned at 11:10 A.M. It appears from the record that the vote was taken at the earlier time, a recess called, and the meeting resumed until adjournment at 11:00 A.M. The record does not disclose the exact time of the vote. *See e.g.,* Deposition of Geoffrey S. Shuff, Esq., Document 27 of the Record, Exhibit 72 at 55.

** The court does not address plaintiffs' § 10(b) claim inasmuch as the parties do not pursue the claim in their briefs.

**19.** Section 14(a), 15 U.S.C. § 78n(a), provides:

It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or of the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78(1) of this title.

**20.** Rule 14a–9, 17 C.F.R. § 240.14a–9(a) provides in part:

No solicitation subject to this regulation shall be made by means of any proxy statement ... containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact necessary in order to make the statements therein not false or misleading....

proached Commonwealth with an expression of interest.

Proxy Statement dated November 12, 1985, Document 36 of the Record, Exhibit 46 at 835b. Plaintiffs contend that this reference to Meridian is inadequate in that it fails to advise shareholders of the terms of the two offers made by Meridian. Defendants, however, maintain that they were not required to disclose such information because Meridian had withdrawn its offer(s) and even if Meridian hadn't, the "offers" were, in actuality, proposals to negotiate. Further, defendants contend, had they disclosed the Meridian proposals, such information might have misled the shareholders. Under the circumstances and undisputed facts of this case, the court agrees.

■■■ Section 14(a) was enacted "to promote 'the free exercise of the voting rights of stockholders' by ensuring that proxies would be solicited with 'explanation to the stockholder of the real nature of the question for which authority to cast his vote is sought.'" *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 381, 90 S.Ct. 616, 620, 24 L.Ed.2d 593 (1970) (citations omitted). To succeed upon a Section 14(a) claim, plaintiffs must demonstrate that those facts omitted by defendants are material. *Wetter v. Caesars World, Inc.*, 541 F.Supp. 68, 71 (D.N.J.1982). The Supreme Court defined materiality in *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976):

An omitted fact is material if there is substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. This standard is fully consistent with [*Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593, (1970)] general description of materiality as a requirement that "the defect have a significant *propensity* to affect the voting process." It does not require proof of a substantial likelihood that disclosure of the omitted fact

would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*TSC, supra* at 449, 96 S.Ct. at 2132 (emphasis in original) (footnote omitted). The question of materiality is an objective one and focuses upon whether, under all the circumstances, the omitted fact would have assumed "actual significance" in a reasonable shareholder's deliberation. *Id.; Dower v. Mosser Industries, Inc.*, 648 F.2d 183, 186 (3d Cir.1981); *Healey v. Catalyst Recovery of Pennsylvania, Inc.*, 616 F.2d 641, 647 (3d Cir.1980).

■■■ In *South Coast Services Corp. v. Santa Ana Valley Irrigation Co.*, 669 F.2d 1265 (9th Cir.1982), the Ninth Circuit Court of Appeals held that there "is no duty to disclose inquiries or indications of interest that do not fall within the category of firm or definite offers." *South Coast, supra* at 1273 (citing *Scott v. Multi-Amp Corp.*, 386 F.Supp. 44, 65 (D.N.J.1974)). The *South Coast* court held that firm offers, *if* more favorable than the offer endorsed by management and presented to the shareholders, must be disclosed in proxy materials. *Id.* Plaintiffs argue that the September 12th letter constituted a firm offer requiring disclosure while defendants label the letter as nothing more than a step in the negotiating process. The court finds it unnecessary to resolve this issue inasmuch as the offer was clearly withdrawn and, thus, disclosure was not necessary.[21]

**21.** The court notes, however, that even if the letters could be classified as firm offers, the record does not support plaintiffs' position that the $39 offer was more favorable than Mellon's $40 offer, tax consequences notwithstanding.

Plaintiffs argue that Meridian's proposal was more favorable because there was a tax advantage to Commonwealth shareholders if Meridian's proposal were accepted. This argument is purely speculative. Plaintiffs' focus upon that

■ While plaintiffs contend that the offer was not withdrawn, it is difficult to understand how it could be otherwise. In attempting to force the negotiation issue, McCullough expressly stated in the September 30th letter that if Commonwealth failed to inform Meridian of its intent to negotiate before the close of business on Friday, October 4, 1985, Meridian intended to withdraw the offer. *See* Letter dated September 30th note 13 *supra*. On October 7, 1985, Meridian issued a press release formally withdrawing the offer. The deposition of Commonwealth's counsel, F. John Hagele, Esq., stated that this fact was confirmed by telephone conversation between himself and counsel for Meridian, Joseph Harenza. During the first conversation between Harenza and Hagele, Geoffrey Shuff, Esq. [Shuff] was present with Hagele. Hagele initiated the call in which he asked Harenza whether Meridian was going to withdraw its proposals as indicated in Meridian's September 30th letter. Hagele advised Harenza further that there would be a board meeting the following morning and "it would be in everyone's best interest if the [Meridian] offer remained outstanding and that no public announcement be made of its withdrawal." Deposition of F. John Hagele, Document 34 of the Record, Exhibit 4 at 116b. Harenza responded that he believed a public release stating that the proposal had been withdrawn had already been initiated. Harenza also told Hagele that he was unsure whether there was time to stop the withdrawal and, if there was time, whether Meridian would be willing to stop the press release. This ended the telephone conversation. Later that morning Hagele again called Harenza [22] while Shuff was still with Hagele. While no speaker phones were used, Hagele believed that McCullough was in the room with Harenza or, at least, that a sidebar conference concerning Meridian's

portion of the Mellon merger plan which calls for a "45/55–cash/stock" exchange. Under Mellon's plan, 45% of the Commonwealth shares would be exchanged for cash (at $40 per share) and the remaining 55% would be exchanged on a share-for-share basis, *i.e.*, the receipt of Mellon shares which would represent a $40 per share Commonwealth value. There is no evidence that there would be an oversubscription, that is, that more shareholders would elect to receive their exchange on a particular basis than allowed. Indeed, Goldman Sach's representative Sapp advised the Board that he did not believe there would be an oversubscription based upon the fact there were a number of larger shareholders who would elect cash over shares. *See* Sapp Deposition, Document 37 of the Record, Exhibit 9 at 124a. While it is true that it is possible that some shareholders who want to receive shares may be forced to take cash, that is not enough to render the Meridian $39 proposal more favorable than Mellon's at $40. Additionally, even if price were not the determinative factor, the Commonwealth directors took into account: the fact that Commonwealth shareholders would receive a higher dividend in a merger with Mellon, *see* Deposition of Henry E.L. Luhrs, Document 34 of the Record, Exhibit 5 at 132b; that Meridian had been growing at a very fast rate and its "track record was yet to be proven," Deposition of Horace McCarty, Document 34 of the Record, Exhibit 7 at 162b; and possible employee/personnel displacement, Deposition of Charles Merrill, Document 34 of the Record, Exhibit 9 at 202b. *See also supra* note 34.

Additionally, the court notes that Meridian's price offer was subject to what is termed a "collar." The September 12th letter, discussing the $38 per share price, *see* Appendix A, explained: "Each share of Commonwealth will be converted into that number of shares needed to produce a $38 value. However, not more than 1.15 shares nor less than .95 shares will be exchanged for each Commonwealth share. If the price of Meridian Common Stock falls below $33 per share at the time of valuation, the maximum exchange ratio would be 1.15. Conversely, if the price of Meridian Common Stock rises above $40 per share, the exchange ratio would remain at .95." The exact value which Commonwealth shareholders might receive under the Meridian proposal, therefore, would vary and was tied to the price of Meridian's stock. *See, e.g.*, Deposition of Henry E.L. Luhrs, Document 34 of the Record, Exhibit 5 at 125b–126b. Thus, a price per share, under Meridian's proposals, would not have been established until the transaction was actually closed. *See* Deposition of Willis W. Shenk, Document 35 of the Record, Exhibit 13 at 332b, and conceivably could be less than $38.00 if the market price fell below $33.00. It was generally anticipated that the price of Meridian stock would drop to some extent after the offer was made public. *See* Sapp Deposition, Document 37 of the Record, Exhibit 9 at 123a.

**22.** Apparently, Harenza had attempted to reach Hagele in the interim but was unsuccessful.

position was held between Harenza and someone in the room with him. Harenza advised that the Meridian news release stating that Meridian had withdrawn its $39 per share offer had been made public and, further, that another news release countermanding the withdrawal release would not be issued unless "either Commonwealth National accepted the offer or Commonwealth National would immediately set a date and place to sit down and enter into negotiations with Meridian." *Id.* at 119b–120b. Specifically, Hagele testified that Harenza then modified this statement and specified that Meridian would "have to consider whether to reinstate the offer" and would withdraw the press release "only if [Commonwealth] management would give them immediate assurance that they would recommend the Meridian proposal to the board...." Hagele Deposition, Document 37 of the Record, Exhibit 22 at 212a–213a (emphasis added). Hagele testified:

"After I responded to Mr. Harenza's first statements of the conditions on which they would premise withdrawal and stated that I felt it was in their interest as well as ours to have a proposition before our board, he, I believe, had a side bar conversation which I did not overhear with Mr. McCullough. That was my impression.

"And he came back on and said that if the next day the Commonwealth National [B]oard authorized negotiations with Meridian, that Meridian would then have to determine whether they wished to reinstate an offer which would be the subject of those negotiations, but that in any event whether or not they reinstated the offer they would be willing to sit down and talk.

"He stated as a modification of his previous position that Meridian would withdraw their previous news announcement that day in effect reinstating their previous proposal only if Commonwealth National management would give them immediate assurance that they would recommend the Meridian proposal to the board of directors the next day. And at that point the conversation terminated." Hagele Deposition at 212a–213a. As noted earlier, there is no affidavit by Harenza; thus, Hagele's version of the conversations is unchallenged.

In spite of the clear indication that Meridian had withdrawn its offer, plaintiffs argue that "the Meridian offer undeniably had been outstanding throughout the negotiations between Commonwealth and Mellon, and to the extent it was formally 'withdrawn,' it was withdrawn only 24 hours prior to the approval of the Mellon merger plan by Commonwealth's Board." Plaintiffs' Brief at 27. Thus, plaintiffs focus upon the timing of the withdrawal to support their position that the specifics of the letters should have been disclosed in the proxy materials.[23] Plaintiffs' reliance is misplaced.

■ The issue is not how long an offer has been withdrawn. Rather, the issue is whether there is a firm, definite offer which is outstanding and available for consideration. *See e.g., Alameda Oil Company v. Ideal Basic Industries, Inc.,* 337 F.Supp. 194, 195 (D.Colo.1972) (holding directors under no duty to disclose a withdrawn offer to shareholders). Plaintiffs' attempt to distinguish *Alameda* from the instant case is not persuasive. By focusing upon the length of time the offer had been withdrawn, a point not emphasized by the *Alameda* court, plaintiffs lose sight of the purpose of Section 14(a). The disclosure provisions of Section 14(a) are designed to protect the value of corporate suffrage and "to promote 'the free exercise of the voting rights of stockholders by ensuring that proxies would be solicited with explanation to the stockholder of the real nature of the

---

**23.** Plaintiffs concentrate upon the argument that the directors believed that they could still negotiate with Meridian regardless of whether Meridian followed through with the threat of withdrawing the offer. *See e.g.,* Merrill Deposition at 236b. This, however, is not dispositive of the matter inasmuch as the defendants subjective belief as to the availability of the offer is irrelevant to whether the offer is, in fact, available or has been withdrawn.

questions for which authority to cast his vote is sought.'" *Bank and Trust Company of Old York Road v. Hankin,* 552 F.Supp. 1330, 1335 (E.D.Pa.1982) (citations omitted). In the case, *sub judice,* there did not exist an outstanding offer from Meridian which a Commonwealth shareholder might consider. Indeed, the court seriously questions whether disclosure of the withdrawn Meridian offers might have been misleading in itself inasmuch as it was uncertain whether, and to what extent, that avenue was still open to Commonwealth. While plaintiffs may claim that Meridian was still interested, the plain undisputed fact is that once Meridian had withdrawn the offers, Meridian was no longer bound by the terms.[24] Had Commonwealth stated "I accept" after the publishing of the press release and oral confirmation of the withdrawal of the offer by Harenza, Meridian was free to respond "too late." At this point, it is unclear what plaintiffs would have expected defendants to disclose in the proxy materials: that Meridian had made an offer (assuming *arguendo* ) but it was no longer available? Or that the offer was no longer available but that Commonwealth directors thought it might be? Or that an offer of $39.00 had been withdrawn although there might possibly be an opportunity to negotiate further? The uncertainties and speculations in this type of disclosure are patently obvious. It was Meridian that affirmatively imposed a deadline and announced its intent to withdraw the offer. If no deadline had been imposed, a different factual situation would have been presented and a different analysis would have been appropriate. Here, however, Commonwealth had no obligation to bow to Meridian's deadline, and, indeed, Commonwealth requested that the deadline be rescinded. Similarly, Meridian's ultimatum, or demand, that Commonwealth management commit itself immediately to recommend the Meridian offer to Common-

wealth's Board (before Meridian would cancel the press release) placed Meridian's proposal, or "offer," in an even more unfavorable and unacceptable position. Commonwealth management realistically was not in a position to make such a commitment given the fact that the Mellon supplemental due diligence was in full swing that very morning. Meridian's "take it or leave it right now" position put Commonwealth in an untenable position. Inasmuch as the Mellon proposal would be on the table, management was hardly in a position to promise to recommend Meridian's proposal to the Board. Further, it cannot be overlooked that Commonwealth, while still primarily interested in a joinder with Mellon, had not foreclosed Meridian as an option inasmuch as Hagele specifically asked that the offer be kept open. In any event, the Meridian offer, having been formally withdrawn was not a material fact which Commonwealth directors had a duty to disclose.[25]

**B.   Misrepresentations of Background of Mellon Merger**

■ Plaintiffs' next argument in support of their contention that the proxy materials issued by Commonwealth were deficient is that the "Background of Merger" section is misleading. Specifically, plaintiffs point to the section which states:

> During the past several years Mellon has expressed to Commonwealth Mellon's interest in exploring possible business combinations between Mellon and Commonwealth whereby Mellon, through the combined entity, could gain access to those markets served by Commonwealth in Pennsylvania's south central counties. After another Pennsylvania bank holding company, on September 19, 1985, made a public proposal to negotiate the purchase of all of the outstanding shares of Commonwealth Common Stock, Mellon again approached Commonwealth with an ex-

---

**24.** That is not to imply that Meridian was bound before withdrawal or that the letters constituted firm and definite offers.

**25.** To the extent that dicta in *United States Smelting, Refining and Mining Co. v. Clevite Corp.,* Fed.Sec.L.Rep. (CCH) ¶ 92,691 (N.D.Ohio 1968) is contrary, this court declines to follow it.

pression of interest. Thereafter Mellon and Commonwealth began preliminary merger discussions. On October 8, 1985, the Plan was approved by the Board of Directors of Commonwealth and the Executive Committee of the Board of Directors of Mellon.

Proxy Statement, Document 36 of the Record, Exhibit 46 at 835b. Plaintiffs contend that this statement is misleading because it implies that Mellon had a long-standing interest in merging with Commonwealth which was renewed by Meridian's recent attempts to merge with Commonwealth. Plaintiffs' Brief at 32. Additionally, plaintiffs argue that the Background Statement does not accurately reflect that the Commonwealth-Mellon merger was negotiated at Commonwealth's request and consummated over a week-end. Defendants counter that Mellon had expressed a long-standing interest in Commonwealth and that negotiations leading to the Mellon merger agreement were initiated by Mellon and the negotiations did span a period longer than the "merger week-end." Even assuming plaintiffs' version is correct, the court does not understand how these facts would reach a level of "actual significance" in a reasonable shareholder's deliberations.

In any event, the deposition of David L. Martin of Mellon clearly demonstrates that Mellon had explored a possible relationship with Commonwealth as early as Spring, 1983. This, at least, supports the statement of "long-standing interest." The remaining "misleading facts" cited by plaintiffs are simply not that important. This court cannot conclude that there is a "substantial likelihood" that these "misleading facts" would have been viewed by the reasonable shareholder as "significantly altering" the "total mix" of information made available. *See Hankin, supra* at 1335 (citing *TSC, supra* 426 U.S. at 449, 96 S.Ct. at 2132). To the extent it is misleading, it is not misleading as to material facts. *See Mills, supra* 396 U.S. at 384, 90 S.Ct. at 621 (cause of action cannot be established by proof of defect so trivial or so unrelated to transaction that correction of defect or imposition would not further interests protected by Section 14(a)).

### C. Commonwealth's Directors' Conflict of Interest

Plaintiffs' final federal claim is that the proxy materials fail to disclose that Commonwealth's management had a conflict of interest by virtue of the promises made by Mellon regarding continuity of management. Specifically, plaintiffs maintain that Mellon promised in an October 8th letter accompanying the Merger Plan that the Commonwealth Board would remain in place with responsibilities unchanged. In a second letter, according to plaintiffs, Mellon also promised that Merrill could offer three-year employment contracts to up to six executives.

It is true that serious conflicts of interest must be disclosed in proxy materials. *Mills v. Electric Auto-Lite*, 396 U.S. 375, 384 n. 6, 90 S.Ct. 616, 621 n. 6, 24 L.Ed.2d 593 (1970). Plaintiffs, however, cite no authority for their position that the above facts amount to a conflict of interest. Plaintiffs do not allege that there was any wrongful purpose or motivation involved.[26] Defendants also note that of the fifteen-member Board, only two directors held positions of senior management—Biechler and Merrill.[27] Merrill's five-year contract, beginning January 1, 1985, was approved by shareholders at the 1985 Annual Meeting. Biechler had already announced in August, 1985, that he would retire at the end of the year. As to the rest of the Board, they would continue in their present role as directors. The court does not find these facts to constitute serious conflicts which would require disclosure in proxy

---

**26.** Defendants admit that some Commonwealth directors have outstanding loans from Commonwealth but there are no allegations that they were received under improper circumstances. The loans are apparently mentioned in the complaint, but plaintiffs do not pursue this point at all in the summary judgment memorandum.

**27.** The vote by Commonwealth directors to merge with Mellon was unanimous.

materials. *See e.g., Rodman v. Grant Foundation,* 608 F.2d 64, 71 (2d Cir.1979) (management need not disclose its motives in proposing action for shareholder approval; especially when the undisclosed motivation is management's desire to perpetuate itself in office); *Bank & Trust Co. of Old York Road v. Hankin,* 552 F.Supp. 1330, 1336 (E.D.Pa.1982) (human nature to desire to continue in position of control and citing *Rodman, supra* ).

As to the six employees to whom Merrill could grant employment contracts, plaintiffs allege no set of facts that remotely infer a conflict of interest. Indeed, as defendants note, Meridian contemplated a similar agreement. *See* September 12th letter (directors and management to continue). As a result, the court rejects plaintiffs' theory that a failure to disclose these "conflicts of interest" renders the proxy materials defective.

## D. Breach of Fiduciary Duty

Plaintiffs' remaining claim is brought pursuant to this court's diversity jurisdiction and alleges that execution of the Investment Agreement and Warrant giving Mellon the right to purchase 24.9% of Commonwealth's outstanding shares at a price of $34.75 was a breach of the fiduciary duty owed by the directors to Commonwealth shareholders. Plaintiffs' argument under the state law claim is three-fold: first, that executing the warrant was a breach of fiduciary duty [28] because it effectively foreclosed competitive bidding; second, in approving the warrant, the directors failed to exercise informed business judgment and finally, that the warrant itself is invalid because it precludes competition.

In Pennsylvania, as in most jurisdictions, officers and directors of a corporation stand in a fiduciary relation to the corporation, and must discharge the duties of their positions in good faith and with the diligence, care, and skill which ordinarily prudent persons would exercise under similar circumstances. These fiduciary obligations have sometimes been described as the duty of care, *i.e.,* the responsibility of the fiduciary to exercise the care that a responsible prudent person in a similar position, would use under similar circumstances, and the duty of loyalty, *i.e.,* the duty not to take advantage of the fiduciary relationship by engaging in self-dealing. *Enterra v. SGS Associates,* 600 F.Supp. 678, 684 (E.D.Pa.1985) (citations omitted). In discussing this duty, Judge Broderick noted that it is the directors, and not the shareholders, who manage the business affairs of the corporation. *Id.* at 685. Thus, to protect directors and to enable them to discharge their fiduciary duties, the directors are protected by the "business judgment rule." This rule provides that directors cannot be held liable for a mistake in judgment—whether it be a mistake of law or fact. *Id.*

Courts, in applying the business judgment rule, have held that the directors are entitled to a presumption of good faith and exercise of sound judgment. *See Enterra, supra* at 685. Indeed, it is only when "it is established that a board of directors has acted in fraud, bad faith, or self-interest, [that] the presumption of the business judgment rule does not apply.... *Id.* (cit-

---

**28.** Unlike many jurisdictions, Pennsylvania has codified the duty owed by directors and officers of a corporation:

§ 1408 Relation of directors and officers to corporation

A. Officers and directors shall be deemed to stand in a fiduciary relation to the corporation, and shall discharge the duties of their respective positions in good faith and with that diligence, care and skill which ordinarily prudent men would exercise under similar circumstances.

B. In discharging the duties of their respective positions, the board of directors, committees of the board, individual directors and individual officers may, in considering the best interests of the corporation, consider the effects of any action upon employes, suppliers and customers of the corporation, communities in which offices or other establishments of the corporation are located and all other pertinent factors.

15 Pa.Stat.Ann. § 1408 (Purdon Supp.1985)

ing Note, *Protecting Shareholders against Partial and Two-Tiered Takeovers: The "Poison Pill" Preferred*, 97 Harv.L.Rev. 1964, 1969 (1984); *Wolf v. Fried*, 473 Pa. 26, 373 A.2d 734 (1977)). Thus, in order to overcome the good faith presumption of the business judgment rule, plaintiffs must make a showing of fraud, bad faith or self-interest. *Enterra, supra* at 686.[29]

While plaintiffs concede that warrants, or "lock-ups" as they are also called, are not *per se* illegal, *see Warner Communications, Inc. v. Murdoch*, 581 F.Supp. 1482, 1491 (D.Del.1984) ("Defensive tactics themselves are illegitimate only if a target's management fails to exercise its business judgment and engages in such tactics for the primary purpose of entrenchment.") (citations omitted), they argue that by giving Mellon the "lock-up", or warrant, designed to prevent competitive bids, the directors removed from the shareholders the right to choose from several available alternatives.

Plaintiffs' Brief at 43. Further, plaintiffs contend that the granting of the warrant was done in a hasty manner without independent evaluation and thus in breach of their fiduciary duty of care. The court disagrees.

First, defendants contend, and plaintiffs do not dispute, that lock-up provisions, or warrants, are very common in bank mergers.[30] Deposition of Richard Allen Sapp, Document 34 of the Record, Exhibit 11 at 289b. Indeed, at oral argument defendants maintained that they properly assumed Meridian intended to incorporate a similar provision had negotiations with Commonwealth resulted in a merger agreement since lock-ups were so common.[31] Second, the deposition testimony of the directors reveals that during merger negotiations with Mellon, Commonwealth attempted to negotiate the warrant out of the merger agreement as well as negotiate over the warrant price.[32] Indeed, defendants per-

---

**29.** Plaintiffs cite *Wolf v. Fried*, 473 Pa. 26, 373 A.2d 734 (1977) and argue that even in the absence of fraud, self-dealing or bad faith, directors may be held personally liable where they have been imprudent, wasteful, careless, and negligent actions and such actions have resulted in corporate loss. Plaintiffs' Reply Brief at 23–24 (quoting *Wolf, supra* at 27, 373 A.2d 734.) There is no evidence, and this court does not conclude from a review of the circumstances here, that any directors were imprudent, wasteful, careless or negligent. Moreover, it is mere speculation to allege that Commonwealth will suffer corporate losses as a result of the approval of the warrant provision.

**30.** Sapp testified:

I said, "Look, this thing provides for Mellon to get compensated. In case another offer comes in and you, the board, decide to pursue that other offer and leave Mellon in your wake, they have provisions in there where you have to pay a penalty for that. But in return for this warrant agreement to protect them in this transaction, they are willing to pay your shareholders $40 in hard value, either value of cash or securities at the closing, and that, once again, these things are very commonplace in these transactions, and I may have mentioned it, it was used in two previous bank mergers I was involved in which was bank of Virginia Union Trust and Suburban," and I said "In fact, this particular type of warrant investment agreement was utilized in the First Wachovia-First Atlanta merger, which was a major interstate deal between

North Carolina and Georgia, so even the particular form of option has been previously used." Deposition of Richard Allen Sapp, Document 34 of the Record, Exhibit 11 at 304b–305b.

**31.** The original September 12th letter outlined conditions to the consummation of the transaction including "a definitive agreement containing the usual representations, warranties, access and other customary provisions" and is broad enough to encompass a lock-up although Meridian denies that one was intended. *See* Document 42 of the Record at ¶ 115.

**32.** Commonwealth and Mellon negotiators agreed to recommend a warrant price to be the closing market price on the day before the Board meeting. On October 7, 1985, the day before the directors of Commonwealth met, the closing market prices was $34.75. This price is reflected in the Investment and Warrant Agreement. According to Sapp, Mellon's initial offer for a warrant price was considered inadequate. Negotiations resulted in the parties agreeing to settle on the closing price of the stock on the last trading date prior to execution of the agreement. Sapp Deposition at 111b. It was anticipated that the agreement would be executed on Monday, October 7, 1985. The applicable closing price, then, would have been Friday's, October 4, 1985. On that day, the price was just over $36.00. *Id.* Because of the supplemental due diligence review was necessary, the agreement was not executed until Tuesday, October 8, 1985. Monday's closing price was $34.75.

suasively orally argued that were it not for the warrant provision, Commonwealth would not be able to keep Mellon as a competitive bidder and alternative to Meridian.

■ The court agrees with defendants that the Commonwealth directors did not breach their fiduciary duty of care to shareholders by agreeing to the warrant provision. It should be noted that the lock-up would only be exercised if one of the five conditions occurred: wilfull breach of the Merger Plan by Commonwealth; failure of Commonwealth shareholders to approve the Plan after an announcement (by someone other than Mellon) of an offer to acquire 25% or more of Commonwealth stock or to acquire, purchase, etc., all or substantially all of Commonwealth's assets; the acquisition of, or right to acquire 25% of the Commonwealth stock exclusive of that stock sold directly or indirectly to such person by Mellon; the commencement by any other person of a tender or exchange offer to purchase Commonwealth securities resulting in that person owning or controlling 25% or more of Commonwealth stock; or any agreement entered into by Commonwealth with another to acquire, merge, etc., with Commonwealth or to purchase all or substantially all of Commonwealth's assets. Proxy Statement, Document 36 of the Record, Exhibit 46 at 845b. In the event that one of these conditions precedent occurred, then Mellon would have the right to purchase 24.9% of Commonwealth's stock at $34.75 per share. The warrant and option price were fully negotiated and were a necessary and integral part of a merger agreement with Mellon. *See e.g.*, Deposition of Charles Merrill, Document 34 of the Record, Exhibit 9 at 201b. A merger with Mellon was considered by the directors to be in the best interests of Commonwealth and its shareholders. *See supra* note 21. Further, the essence and effects of the Investment Agreement and Warrant were fully disclosed to shareholders who ultimately voted to approve the merger agreement. As such, this court cannot conclude that the directors' approval constituted a breach of their fiduciary duty. *See Gearhart v. Smith International Inc.*, 741 F.2d 707, 722 (5th Cir.1984) (holding warrant did not breach fiduciary duty because *inter alia* court found warrant was necessary and integral part of agreement and directors relied upon expert financial advice). Plaintiffs simply have not met their burden of demonstrating that the directors acted in bad faith, fraudulently or in self-interest. Accordingly, plaintiffs cannot overcome the presumption that the directors acted in good faith and with sound judgment. *See Enterra, supra.*

Plaintiffs also cite the Board's undue haste in negotiating with Mellon over a week-end and approving the entire agreement on Tuesday morning, October 8, 1985. Plaintiffs contend that the directors did not receive advance notice that the Tuesday meeting would be to discuss the Mellon merger and, consequently, the directors did not have an opportunity to review beforehand the lengthy financial and legal documents presented to them at the meeting. Plaintiffs further allege that no director requested an adjournment in order to further study and consider the documents and the vote of approval was taken in less than two hours after the meeting had begun.

Defendants counter that, for security reasons,[33] mergers in the banking industry are consummated very quickly. Additionally, defendants declare that once it was clear that Commonwealth was going to have to merge with someone; *see e.g.*, Dep-

---

There was an effort to negotiate a higher price than the $34.75 by Sapp, Shuff and Goodman Sachs representatives. *Id.* at 113b. Commonwealth, however, was unable to negotiate a higher price than the $34.75 closing stock price of Monday, October 8, 1985. *Id.*

**33.** Security is used here in the sense of keeping pre-merger discussions confidential to prevent any leaking of information which would affect the market price of either corporation's stock.

**1148**

osition of Horace McCarty, Document 24 of the Record, Exhibit 7 at 1746, there was no reason to hold Mellon's offer in abeyance when they believed it was the best possible offer.[34] Further, the directors had met extensively on September 18, 1985 regarding Meridian's September 12, 1985 letter. As a result, terms and conditions of merger proposals from Meridian were very familiar to the directors by the time they met on October 8, 1985.

■ Plaintiffs devote considerable argument to the Commonwealth Board's decision to approve the Mellon merger on Tuesday morning without requesting adjournment to review documents or to postpone the vote pending further inquiry. The court, however, finds it inappropriate to focus only upon the morning activities inasmuch as this Commonwealth Board had been discussing potential merger partners for close to a year. As early as February, 1985, merger overtures by Meridian resulted in an Executive Committee meeting. By March, 1985, Commonwealth had retained Goldman Sachs for investment banking expertise. In April, 1985, the Commonwealth Board extensively discussed Goldman Sachs' evaluation of Commonwealth's merger possibilities and concluded it was in Commonwealth's interests to remain independent. By the time the September letters were mailed, the Commonwealth directors were fairly familiar with merger discussions and its intricacies. On September 17, 1985, the Commonwealth Executive Committee met for four-to-five hours, in consultation with Goldman Sachs and legal advisors, to discuss Meridian's September 12th letter. The next day, on September 18, 1985, the entire Board met, again with Goldman Sachs, and approved the Executive Committee's resolve to not enter into negotiations with Meridian. *See* Part I, *supra.*

A review of this history reveals that plaintiffs' argument that the Mellon merger decision should have taken longer or been postponed is unpersuasive. Indeed, under the circumstances, it appears that considerable time was spent by the Commonwealth directors contemplating the future and best interests of Commonwealth and its shareholders.

At the meeting itself, Merrill described the events since the last board meeting of September 19, 1985, and the negotiations over the week-end with Mellon. Mellon's offer was described, as were specifics of the offer, such as the Investment Agree-

**34.** Defendants support this contention by noting that Mellon just barely made the $40 per share offer and that it was Goldman Sachs' opinion that Meridian, due to dilution problems, would be unable to go any higher. Sapp testified:

"We then reviewed for Meridian a range of prices of $39 to $42 on a common stock pooling basis, which represented wheret he current proposal was and the top of the Mellon range previously known to us. And the dilution there shows that a pro forma for 1985 at $39, Meridian was taking 10 percent dilution, rising to 12 percent dilution at $42 a share. In 1986 they were taking 7 percent dilution, and if in fact everything worked out they would break even in 1986.

"However, we said 10 percent dilution for a bank is a substantial dilution, especially for a bank its size, especially given the earnings quality that it is purchasing for that, that there was a substantial risk that their stock could fall off."

Sapp Deposition, Document 37 of the Record, Exhibit 9 at 120a–121a. *See e.g.,* Deposition of John Biechler, Document 34 of the Record, Exhibit 2 at 20b–21b; Deposition of Horace McCarty, Document 34 of Record, Exhibit 6 at 169b; Deposition of Richard Allen Sapp, Document 34 of the Record, Exhibit 11 at 270b. The directors also concluded that a merger with Mellon would yield a higher dividend for Commonwealth shareholders. Deposition of Henry Luhrs, Document 34 of the Record, Exhibit 5 at 131b. Further, non-financial considerations such as employee job security, name retention, community service weighed in favor of a Mellon merger. Deposition of William H. Alexander, Document 34 of the Record, Exhibit 1 at 4b–5b; Luhrs' Deposition at 124b; McCarty Deposition at 174b; Deposition of Charles Merrill, Document 34 of the Record, Exhibit 9 at 201b. The Pennsylvania statute recognizes that directors in discharging their fiduciary duties and what is in the best interests of the corporation may consider the effects of any action on employees, customers, the community and any other pertinent factor. 15 Pa.Stat.Ann. § 1408 B (Purdon Supp.1985).

ment and Warrant. After Merrill's presentation, Richard Allen Sapp of Goldman Sachs addressed the Board explaining in detail aspects of the Mellon merger, including price, form of consideration, process by which shareholders would elect cash or stock, tax consequences, Board composition, and merger structure. Sapp also explained the warrant provision in detail noting that warrants are common in bank merger transactions. Additionally, he advised the directors that Mellon had insisted absolutely upon inclusion of the warrant provision and of Commonwealth's negotiation attempts to secure a higher price. Sapp cautioned the Board that a delay in the Mellon merger would result in a substantial risk that Mellon "would simply walk away."

It must be emphasized that the directors, at this point, had been informed that the Meridian offer had been withdrawn and that any further delay might result in Mellon walking away altogether. Plaintiffs have offered no evidence to rebut this testimony. Under the circumstances, the directors cannot be faulted for approving the Mellon merger proposal in the manner in which they did. Plaintiffs argue that the directors could have or should have delayed somewhat or attempted to ascertain whether they could delay. Even conceding that this alternative may have been available, however, does not amount to a breach in fiduciary duty nor does it equate the action the directors did take as unreasonable or in error. After Sapp's presentation, legal counsel for Commonwealth discussed, *inter alia*, the structure of the corporation after merger. At the conclusion of these presentations, including questions and discussions, the Commonwealth Board of Directors voted unanimously to approve the proposed Mellon merger.

As noted, plaintiffs insist that the directors acted too quickly in approving the merger and should have adjourned to read all of the documents and, perhaps, to take

the risk of a Mellon "walk away" to see if Meridian would go higher. Considering the previously mentioned factors, the directors' willingness to take the risk is understandable. With conclusory allegations, plaintiffs also speculate that the directors did not understand the key terms of the Mellon merger. The record and deposition testimony, however, reveal otherwise.

Based upon the record and the undisputed facts, this court concludes that the Commonwealth Board of Directors did not breach their fiduciary duty. Plaintiffs have presented no evidence which would lead this court to conclude that the directors had not discharged their duties in good faith and in exercise of sound business judgment. Nor have plaintiffs introduced testimony which rebuts testimony as to defendants' beliefs and actions at the board meeting. Further plaintiffs do not challenge the accuracy of Goldman Sachs' representations to the directors regarding the Mellon merger plan. It is clear that plaintiffs disagree with the directors' judgment and decision and equally clear that they are unhappy about the Mellon merger. That, however, is insufficient to invalidate the decision of the directors.

IV. Conclusion

In conclusion, this court finds that based upon the record before the court plaintiffs have failed to demonstrate, as a matter of law, that the proxy materials contained materially misleading statements or failed to disclose material facts to which a reasonable shareholder would attach significance in the total mix of information provided. The court also finds that plaintiffs have failed to demonstrate any evidence from which one could reasonably infer that Commonwealth directors breached the duty of fiduciary care owed to their shareholders when the directors voted to approve the Commonwealth-Mellon merger.

As a result, plaintiffs' Motion for Summary Judgment will be denied.

APPENDIX A

Meridian Bancorp, Inc.

35 N. 6th Street

P.O. Box 1102

Reading PA 19603

September 12, 1985

Board of Directors
Commonwealth National Financial Corporation
10 South Market Square
Harrisburg, PA 17108

Mr. Jack McSpadden,
Vice President
Goldman, Sachs & Co.
85 Broad Street
New York, NY 10004

Gentlemen:

On behalf of Meridian Bancorp, Inc. ("Meridian"), I am very pleased to make the following offer by which Meridian would affiliate with Commonwealth National Financial Corp. ("Commonwealth") by a merger of Commonwealth into a newly created Meridian subsidiary. It is Meridian's firm belief that such an affiliation of our corporations best serves the interests of our respective shareholder groups and the customers and communities which we each serve. Because of our belief in the prospect for continuing the improvement in Commonwealth's performance, the offer we are making represents a significant premium to Commonwealth's current market price, most recent quarter and year-end book values and an extremely generous multiple to both the historical and prospective earnings disclosed in Commonwealth's prospectus forming a part of its recent registration statement, on Form S–2, filed with the Securities and Exchange Commission.

*Proposed Financial Terms*

100% common stock

We propose that each of Commonwealth's over 2,980,000 outstanding shares and any shares issuable under existing options or warrants, as disclosed in the registration statement, be exchanged in connection with the merger for newly issued shares of Meridian giving Commonwealth shareholders a market value of approximately $38. Each share of Commonwealth will be converted into that number of shares needed to produce a $38 value. However, not more than 1.15 shares nor less than .95 shares will be exchanged for each Commonwealth share. If the price of Meridian Common Stock falls below $33 per share at the time of valuation, the maximum exchange ratio would be 1.15. Conversely, if the price of Meridian Common Stock rises above $40 per share, the exchange ratio would remain at .95.

A value of $38 for Commonwealth's shares represents approximately 160% of Commonwealth's 6/30/85 (adjusted for the 2 for 1 split) book value per share and a 45% premium to the $26.25 bid on Commonwealth's shares just prior to the recent announcement of a 625,000 common share offering. This value also represents 32.2 times 1984 EPS before extraordinary item (adjusted for the 2 for 1 split); it is also 18.8 times 1985 projected EPS based on a simple annualization of income before extraordinary item for the period ended June 30, 1985. Based on a projected annualized dividend of $.52 ($.13 per quarter) on Commonwealth common shares, the exchange ratio contemplated would increase dividends by more than 265% for Commonwealth's shareholders. In other words, Meridian is willing to pay a price *now* which reflects what it perceives to be Commonwealth's market value (plus a premium) when Mr. Merrill and the remainder of Commonwealth's management team succeed in returning Commonwealth's profitability to normal levels 2–3 years from now.

Because of the extraordinary premium represented by this offer, we believe that it should not be ignored by Commonwealth's management and is one which should be reviewed by Commonwealth's entire Board of Directors, with due consideration given to their obligation to submit this offer to Commonwealth's shareholders who would most certainly vote in favor of the merger, if given an opportunity to do so. You

should also know that we intend to send a copy of this letter directly to each individual Commonwealth director and to disclose the terms of this offer to the public, or at least to holders of certain of the largest blocks of shares of Commonwealth's common stock (including Commonwealth National Bank's Trust Department), if Commonwealth refuses to enter into good faith negotiations with us by the close of business on Monday, September 16, 1985.

*Board Composition*

Our intent would be that Commonwealth's existing Board of Directors would nominate three of its members, acceptable to Meridian, to be added to Meridian's Board of Directors. All Commonwealth Board members would, of course, continue to serve on Commonwealth National Bank's Board of Directors.

*Management*

Commonwealth management would continue in existing positions. Existing employment agreements would be honored, of course.

*Effect on Community*

Commonwealth will be operated initially as a separate banking subsidiary of Meridian, with responsibility not only for Commonwealth branches in its trading area, but also for certain Meridian branches in Lebanon and, perhaps, Lancaster counties. With Meridian's financial and managerial resources supporting Commonwealth, the merger should benefit Commonwealth's customers and the communities which Commonwealth serves.

*Anti-Competitive Effects*

Based on informal conversations with the staff of the Federal Reserve Bank of Philadelphia, neither the banking regulators nor the Department of Justice should raise any serious anti-trust or related objections to the combination under the DOJ's recently revised merger guidelines.

*Conditions*

Consummation of the transaction will require the execution of a definitive agreement containing the usual representations, warranties, access and other customary provisions, approval thereof by each of our respective Boards, the required affirmative vote of Commonwealth's and Meridian's shareholders, and required regulatory approvals.

If Commonwealth completes the public offering of stock covered by Commonwealth's registration statement on Form S–2 filed on September 10, 1985, it will be necessary for Meridian to revise the terms of this offer downward to reflect the effects of such offering. If Commonwealth does not complete the offering, Meridian would be willing to discuss an interim capital infusion, if you believe it necessary.

———

As a substantial Commonwealth shareholder, we believe that Commonwealth should give serious consideration to disclosing the existence of this offer, both in the prospectus forming part of Commonwealth's S–2 registration statement relating to the common share offering, and otherwise in the form of a public announcement.

Please be advised that Meridian has no intent to commence a non-negotiated tender offer or exchange offer for Commonwealth. We desire to negotiate a merger with your Board's support and approval.

We at Meridian are excited over the prospect of affiliating our two companies. We look forward to meeting with you at the earliest possible date.

Very truly yours,
MERIDIAN BANCORP, INC.
/s/ Samuel A. McCullough
By: Samuel A. McCullough
President and Chief
Executive Officer